**Eugenia I. GINZBURG, M.D., et al.**

v.

**MEMORIAL HEALTHCARE SYSTEMS, INC., et al.**

**Civil Action No. H–96–0907.**

United States District Court, S.D. Texas, Houston Division.

Dec. 24, 1997.

*ORDER*

GILMORE, District Judge.

Pending before the Court is Defendants' motion for Summary Judgment (Instrument No. 89). Having reviewed the submissions of the parties and the applicable law, this Court determines that Defendants' motion should be **GRANTED**.

## I. Background

Plaintiff Dr. Eugenia Ginzburg ("Ginzburg") is a physician specializing in the practice of perinatal-neonatal medicine. Perinatal-neonatal medicine is a subspecialty of pediatrics which involves the treatment of infants in their first two to three months of life. Such treatment includes newborn surgery, the management of the infant's lung and heart conditions, the early detection or prevention of neurological and biochemical diseases and the diagnosis of congenital anomalies. Hospital care of newborns is allocated among three different levels of nurseries, Level I, Level II, and Level III. Defendant Memorial Hospital Southwest's ("Memorial") nurseries are equipped to provide care at each of these three levels.

Level I care consists of the "surveillance and care of all patients admitted to the obstetric service with an established triage system for identifying high-risk patients who should be transferred to a facility that provides level II or level III care" and the "evaluation of the condition of healthy neonates and continuing care of these neonates until their discharge." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 7 at 4). Level II care entails the "management of high-risk mothers and fetuses" and the "management of small, sick neonates with a moderate degree of illness." *Id.* at 4. In addition, "level II care pertains to the neonatal expertise required to manage otherwise normal newborns weighing between 1,500–2,500 grams." *Id.* Seventeen hospitals in the greater Harris County area have level II nurseries.

Level III care involves the "provision of comprehensive perinatal care services for mothers and neonates of all risk categories." *Id.* at 4–5. Newborns weighing less than 1,500g or under 32 weeks of gestation and fetuses requiring immediate, sophisticated care are placed in Level III nurseries. *Id.* The neonatologist is usually requested to treat the Level II and Level III babies, as pediatricians, who are generally qualified to care for Level I patients, lack the requisite degree of training to provide proper medical attention for infants requiring more specialized treatment. (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 1, Ginzburg Aff. at 8). Moreover, Level III nurseries must have certain equipment and a nursing staff qualified to assist the neonatologist in providing the round-the-clock monitoring often necessary in treating such high risk infants. There are ten hospitals in Harris County with Level III nurseries. Ginzburg claims that seventy-five

percent of her income in the last ten years can be attributed to her care of Level III infants.

In 1987, Ginzburg was both appointed to Memorial's medical staff and awarded staff privileges to treat patients in the Hospital's Pediatric Section. The award of such privileges at Memorial, however, merely allows a physician to practice medicine at the Hospital; it does not entitle that physician to compensation from the Hospital or a guarantee of patient referrals. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Exhibit W, Eastham Aff. at 2). Neither is a physician appointed to Memorial's medical staff considered a Hospital employee. *Id.* Currently, Ginzburg has similar privileges at ten other Harris County hospitals.

A physician is appointed to the medical staff at Memorial for a term of only two years. At the expiration of such term, the physician is required to apply both for reappointment to the medical staff and for the renewal of clinical privileges. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Exhibit W, Eastham Aff. at 2). In accordance with the hospital's bylaws, Memorial's Board of Trustees ("Board") ultimately decides whether to grant or deny a physician's application for reappointment. *Id.* Although without final authority over staff selections, the medical staff is, however, responsible for making recommendations to the Board regarding each candidate for reappointment and the delineation of that candidate's clinical privileges. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90, Exhibit C, subexhibit 2 at 4–5). The medical staff is also responsible for performing "peer review, quality improvement, and utilization review for the Medical staff and Hospital." *Id.*

In 1993, Defendant Dr. Maurice Leibman ("Leibman"), Chief of the Medical Staff, received reports from the Nursing Administration regarding behavior engaged in by Ginzburg, which the Administration believed to constitute verbal abuse and harassment of the nursing staff. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Exhibit W, subexhibit 1 at 139). Also

at this time, Leibman was provided incident reports or complaints regarding Ginzburg's patient care. *Id.;* (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Exhibit W, subexhibit 22). In response to these reports, Leibman requested that the Pediatric Section conduct a review of Ginzburg's charts and more thoroughly investigate the patient care issues, if any, raised by such a review. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90, Exhibit F, Leibman Aff. at 2). In addition, Leibman met with Ginzburg regarding the Nursing Administration's allegations, warning her that if such behavior existed and if it continued it would be grounds for disciplinary or corrective action under Memorial's Bylaws. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Exhibit W, subexhibit 1 at 139).

Disciplinary action is defined under the bylaws as "action such as reprimands or probation without supervision which do not presently and substantively affect the member's privileges." (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90, Exhibit C, subexhibit 2 at 42). Corrective action includes "a recommendation against reappointment to the medical staff...[and] a recommendation that the privileges of a member be reduced, suspended, or revoked." *Id.* The bylaws further provide that "when a corrective action is taken against a member of the medical staff, that member is entitled to the procedural rights of review provided for in the Procedural Review plan," which entitles a practitioner to a hearing following an adverse action or recommendation. *Id.* On the other hand, "when discipline is taken against a medical staff member, that member is not automatically entitled to the procedural rights of review." *Id.*

On July 22, 1994, Defendant Dr. John Zerwas, who succeeded Leibman as Chief of Staff, placed Ginzburg on probation, without supervision, for a period of twelve months due to her continued disruptive conduct in the nurseries. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90, Exhibit O, Zerwas Aff. at 2). Again,

Ginzburg was warned that disruptive conduct which in reasonable likelihood would adversely affect patient care or interfere with the proper operation of the Hospital was, according to Hospital bylaws, grounds for more serious corrective action. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Exhibit W, subexhibit 1 at 139). Ginzburg was also offered an opportunity to participate in teamwork counseling sessions with the nursing staff in effort to improve the working relationships in the nurseries. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Exhibit W, subexhibit 1 at 139). Ginzburg, however, declined to participate in any such counseling sessions. *Id.* Finally, three new nursery operating policies were enacted in attempt to clarify the obligations of the staff, including the physicians, and outlined a uniform method for handling disputes as they arise. *Id.*

In July of 1995, after Ginzburg's probationary period ended, Memorial's administration continued to receive reports that Ginzburg was neither complying with Hospital policy nor attempting to improve her allegedly disruptive behavior. *Id.* at 140–41. By November of 1995, six nurses in the Pediatric Section had either requested to be transferred out of the nursery in which Ginzburg worked or had terminated their employment with Memorial, citing their inability to work with Ginzburg as the reason for their request for change in staff status or their resignation. *Id.* at 142. In addition, Defendant Phillip Tucker ("Tucker"), a social worker employed by Memorial and assigned to the Maternal and Child Health Department, reported that he was verbally harassed by Ginzburg when he informed Ginzburg of a family's desire to transfer the care of their baby to another physician. *Id.* at 354. On November 22, 1995, Defendant James Eastham, Memorial's Vice President and Chief Executive Officer, notified Ginzburg in writing of the problems created by her disruptive behavior, warning her that "in the event of any further instance of disruptive conduct...[her] medical staff privileges [would be] subject to emergency suspension." *Id.* at 355.

During this same year, Ginzburg was required, pursuant to the bylaws, to file a request for reappointment to the medical staff. Ginzburg's application was forwarded, in accordance with Hospital procedure, to Memorial's CEO, Eastham, who in turn, submitted the application to the Credentials Committee. Under the bylaws, the Credentials Committee reviews and investigates the practitioner's "professional competence, qualifications, character, prior behavior, ethical standing, professional or other conduct inside or outside the Hospital, information from the Section and any other sources, and any other evidence it deems appropriate." (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90, Exhibit C, subexhibit 2 at 33). The bylaws also state that "the Committee may interview the Practitioner, may contact any third party or other informational source, may use any outside reviewer, if appropriate, or may appoint an adhoc committee to conduct additional investigation." *Id.*

The Credentials Committee met on November 28, 1995, to discuss and ultimately issue a recommendation regarding Ginzburg's application for reappointment. According to the bylaws, if a Credentials Committee's recommendation is favorable, it is forwarded by the CEO to the Medical Executive Committee, which reviews the decision and issues its own recommendation regarding the candidate's reappointment. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90, Exhibit C, subexhibit 2 at 34). If the recommendation of the Medical Executive Committee is also favorable, the application is then submitted to the Joint Hospital Conference Committee for its review. *Id.* at 35. A favorable recommendation from the Joint Hospital Conference Committee is immediately presented to the Board for consideration at its next regular meeting. *Id.* If an adverse recommendation is issued at any stage during this process, the practitioner is entitled to a hearing. *Id.* at 56.

In consideration of Ginzburg's application, the Credentials Committee reviewed materials presented by Eastham which outlined his concerns about Ginzburg's disruptive con-

duct. On behalf of the Hospital's administration, Eastham recommended the denial of Ginzburg's application, stating that "[t]he atmosphere of harassment and intimidation in the Nurseries due to Dr. Ginzburg's threatening behavior, verbal abuse and threats of legal recourse has interfered with the proper operation of the Hospital and can no longer be tolerated." *Id.* at 142–43. The Committee did not issue its recommendation after this initial meeting; rather it decided to reconvene on December 15, 1995, to consider additional evidence and for further discussion of the matter. That day, however, the Committee voted unanimously to deny Ginzburg's request for reappointment.

Ginzburg was thereafter notified of the Committee's recommendation and upon receipt of such notice, Ginzburg timely requested a hearing. The hearing was held on November 14, 1996, and conducted in accordance with the provisions of the bylaws. A hearing panel was selected, comprised of members of the medical staff who had neither participated in the Credentials Committee's decision nor were Ginzburg's direct economic competitors. Ginzburg was permitted, through her attorney Larry Boyd ("Boyd"), to address the panel, present evidence and cross examine all witnesses. After the presentation of the evidence, the panel deliberated, ultimately deciding that there was sufficient evidence to support the Credentials Committee's recommendation that Ginzburg's application for reappointment should be denied. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Exhibit W, subexhibit 4). Ginzburg then requested to appeal the panel's decision and a hearing on this matter was conducted by the Joint Hospital Conference Committee on September 18, 1997. The seventeen member committee comprised of both lay persons and physicians, none of whom practice neonatology or were Ginzburg's competitors, unanimously recommended against Ginzburg's reappointment. (Bryant Aff. at 2). The recommendation of the Joint Hospital Conference has been referred to the Board, which will issue its final decision regarding Ginzburg's application for reappointment at its next regular meeting. (Appendix to Defendants' Motion for Summary Judgment, In-

strument No. 90, Exhibit C, subexhibit 2 at 69–70). Ginzburg has meanwhile retained full privileges to admit and treat patients at Memorial.

Ginzburg has consistently denied all charges brought against her, maintaining throughout this almost four year process that she has neither engaged in disruptive conduct nor harassed any Hospital employees. Ginzburg instead contends that all allegations asserted against her were invented by the Hospital and certain of its officers for the purpose of eliminating her as a competitor and medical care provider. Specifically, Ginzburg contends that "the Hospital...by and through its agents, employees and officers... joined in a conspiracy with [Ginzburg's] principal competitors at the Hospital...Drs. Cox, Moore and Downey [neonatologists who practiced with Ginzburg in the Pediatric Section]...in an effort to destroy [Ginzburg's] practice" because Ginzburg had filed complaints regarding "deficiencies in Hospital procedures and nursing care" and because Ginzburg refused "to skimp on care given to Medicaid and uninsured babies." (Plaintiffs' Further Response in Opposition to Summary Judgment, Instrument No. 136 at 1–2). Ginzburg alleges that the intent of the conspiracy was ultimately to remove her from the medical staff so that the Defendants could "fully and successfully accomplish the cover-up of the medically and clinically inappropriate care" which Ginzburg identified in the numerous reports she had submitted to the medical staff and the hospital administration. (Plaintiffs' Amended Complaint, Instrument No. 45 at 7).

Based on her belief that she was the victim of an unlawful conspiracy, Ginzburg and Neonatal Critical Care, P.A. ("NCC"), the business entity through which Ginzburg provides her medical services, filed this suit on March 19, 1996, joining the following as defendants: Memorial, Zerwas, Leibman, Eastham, Tucker, Dr. Hillel Hurwitz ("Hurwitz"), former Chairman of the Pediatric Section, Dr. Hugh Gilmore ("Gilmore") former Director of Clinical Quality Improvement and current Assistant Vice President of Medical Affairs, Dr. Margo Cox ("Cox"), a practicing neonatolo-

gist in Memorial's Pediatric Section, Dr. Valerie Moore ("Moore"), a practicing neonatologist in Memorial's Pediatric Section, Kenneth Wine ("Wine"), Memorial's Executive Vice President and current Chief Operating Officer, Gloria Tobin ("Tobin"), a registered nurse and Assistant Vice President for Patient Care Services, and Anne Stefan ("Stefan"), former Nursing Director of Women's and Children's Services. Ginzburg contends that the Defendants engaged in unlawful concerted conduct in violation of Section One of the Sherman Antitrust Act, 15 U.S.C. § 1 as evidenced by Downey's, Cox's and Moore's refusal to provide "cross-coverage" or temporary treatment for Ginzburg's patients in Ginzburg's absence from the Hospital, by Memorial's refusal to allow Ginzburg to participate in the Hospital's formal patient referral process and by Hospital administration's and certain members of Memorial's medical staff's coercive attempts to convince other staff members not to refer patients to Ginzburg, thereby "blacklisting" Ginzburg and impeding her ability to acquire new patients.

On August 29, 1997, Defendants filed this motion for summary judgment, arguing that dismissal is appropriate both because Ginzburg lacks standing to assert an antitrust claim and because she has failed to produce evidence to establish either the existence of a conspiracy or that the alleged acts performed in furtherance of such conspiracy had a detrimental affect on competition. In addition, Defendants contend that they are entitled to immunity under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101–11152, and pursuant to a release executed by Ginzburg on April 27, 1995, which absolves Memorial and its authorized representatives, employees and agents from all civil liability arising from any acts or statements made in connection with medical staff appointment proceedings or other hearings and appellate reviews.

## II. Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. Anderson, 477 U.S. at 248–49, 106 S.Ct. at 2510. If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. Anderson, 477 U.S. at 249, 106 S.Ct. at 2511; see Lewis v. Glendel Drilling Co., 898 F.2d 1083, 1088 (5th Cir.1990), cert. denied, 502 U.S. 857, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991). The summary judgment procedure, therefore, "enables a party 'who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues.'" Microsoft Corp. v. CMOS Technologies, Inc., 872 F.Supp. 1329, 1334 (D.N.J.1994) (quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and for identifying those portions of the record that demonstrate such absence. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); Leonard v. Dixie Well Serv. & Supply, Inc., 828 F.2d 291, 294 (5th Cir.1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)) (emphasis in original); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Leonard, 828 F.2d at 294. To sustain the burden, the nonmoving party must produce evidence admissible at trial. Anderson, 477 U.S. at 255, 106 S.Ct. at 2514; Thomas v.

*Price,* 975 F.2d 231, 235 (5th Cir.1992) ("To avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue. . . ."). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonable find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

## III. Section 1 of the Sherman Act

■ Section 1 of the Sherman Act provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The terms " 'contract, combination. . . or conspiracy' are used interchangeably to describe the requisite agreement between two or more persons to restrain trade." *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1455 (11th Cir. 1991) (quoting 15 U.S.C. § 1); *see also Castelli v. Meadville Medical Center,* 702 F.Supp. 1201, 1204 (W.D.Pa.1988). Section 1, therefore, does not prohibit every conceivable restraint of trade; rather it forbids only those which result from concerted action. *Potters Medical Center v. City Hosp. Association,* 800 F.2d 568, 572 (6th Cir.1986); 1 Julian O. Von Kalinowski, Peter Sullivan & Maureen Mcguirl, Antitrust Law And Trade Regulation, § 11.02 [2] (2d ed.1997). Unilateral conduct, on the other hand, is regulated by section 2 of the Sherman Act, 15 U.S.C. § 2, and "is unlawful only when it threatens actual monopolization." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984).

■ To establish a section 1 violation, a plaintiff must prove: (1) concerted action by the defendants; (2) which resulted in an unreasonable restraint on trade; and (3) that proximately caused injury to plaintiff's business. *Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422, 424 (5th Cir.1981); *Almeda Mall, Inc. v. Houston Lighting & Power Co.,* 615 F.2d 343, 350 (5th Cir.1980); *M.C. Manufacturing Co. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1063 (5th Cir.1975).

■ "Concerted activity within the scope of § 1. . . occurs when one business entity takes action at the request of a second business entity." *Robinson v. Magovern,* 521 F.Supp. 842, 907 (W.D.Pa.1981); *see also Imperial Point Colonnades Condominium Inc. v. Mangurian,* 549 F.2d 1029, 1043 (5th Cir.1977). In order to determine whether such activity results in an unreasonable restraint of trade, courts generally analyze the restraint at issue under the rule of reason, which requires the fact finder to consider a variety of factors, including "specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan,* —— U.S. ——, 118 S.Ct. 275, 278–79, 139 L.Ed.2d 199 (1997). The rule of reason inquiry determines whether " 'the restraint imposed is such as merely regulates and perhaps promotes competition or whether it is such as may suppress or even destroy competition.' " *Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986) (quoting *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918)). "The focus is on the actual effects that the challenged restraint has had on competition in a relevant market." *Bhan v. NME Hosp., Inc.,* 929 F.2d 1404, 1410 (9th Cir.1991). Thus, in order to sustain her burden of proof under the rule of reason, the plaintiff must prove an adverse effect on competition in general, and not just "on any individual competitor or on plaintiff's business." *Reazin v. Blue Cross & Blue Shield of Kansas,* 899 F.2d 951, 960 (10th Cir.1990).

■ In contrast, certain restraints, are, due to their "predictable and pernicious anticompetitive effect" deemed unreasonable as a matter of law without examination into the purpose of the restraint and the relevant market affected thereby or without evidence demonstrating any resulting adverse effects on competition. *State Oil,* —— U.S. ——, 118 S.Ct. 275, 279, 139 L.Ed.2d 199; *Bhan,* 929 F.2d at 1410. Restraints which fall in this "per se" category are those that "facially appear[ ] to be one[s] that would always or

almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. Columbia Broad. System, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). Per se rules "are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *N.C.A.A. v. Board of Regents of Univ. of Oklahoma,* 468 U.S. 85, 103–04, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984). However, "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations...." *United States v. Topco Assoc., Inc.,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). Consequently, "courts have been slow to...extend the per se analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Indiana Fed'n of Dentists,* 476 U.S. at 458–59, 106 S.Ct. at 2018.

Ginzburg asserts that she has satisfied her burden of producing sufficient evidence to establish a section 1 violation. Specifically, Ginzburg contends that she has proffered proof of two separate conspiracies formed by Defendants in effort to eliminate her as viable competitor from the relevant marketplace. Ginzburg claims that a conspiracy existed both between her direct competitors—Cox, Moore and Downey, and between the Hospital administration and the medical staff. (Plaintiffs' Memorandum of Law in Response to Defendants' Motion for Summary Judgment, Instrument No. 109 at 6); (Plaintiffs' Further Response in Opposition to Summary Judgment, Instrument No. 136 at 1–2).

Ginzburg next argues that the evidence in the record "reveals at least three distinct 'concerted refusals to deal'" or "group boycotts"—restraints which, according to Ginzburg, are per se unreasonable, violating the Sherman Act as a matter of law. (Plaintiff's Further Response in Opposition to Summary Judgment, Instrument No. 136 at 5–6). Ginzburg identifies these three alleged unlawful restraints as: (1) "the cross-coverage group boycott"; (2) "the hospital referrals group boycott"; and (3) "the blacklist group boycott". (Plaintiffs' Further Response in Opposition to Summary Judgment, Instrument No. 136 at 6–13).

According to Ginzburg, the "cross-coverage group boycott" occurred in 1994 when Cox, Downey, and Moore agreed to terminate their cross-coverage agreement, which provided for the assumption of patient care by available physicians during another physician's absence, after such agreement had been in effect between the four neonatologists for nearly seven years. Ginzburg describes the "hospital referrals group boycott" as an agreement between Cox, Downey, and Moore and the Hospital to "restrict [patient] referral services to Dr. Ginzburg and to provide referrals on a discriminatory basis." (Plaintiffs' Further Response in Opposition to Summary Judgment, Instrument No. 136 at 9–10). The "blacklist group boycott", Ginzburg claims, consisted of eight allegedly sham peer review proceedings, culminating in the Credentials Committee's recommendation that Ginzburg's application for reappointment be denied. *Id.* at 10. Ginzburg contends that the medical staff initiated each peer review for the sole purpose of ruining her professional reputation, "creat[ing] the impression among Dr. Ginzburg's source of referrals that Dr. Ginzburg was out of favor with the hospital, rendering substandard care, and not a suitable neonatologist to whom to refer patients." *Id.* at 10–11. Ginzburg also asserts that the medical staff, as a part of the blacklisting effort, actually confronted "doctors referring cases to Dr. Ginzburg [and] urg[ed] them not to do so." *Id.*

Ginzburg maintains that by establishing the existence of a per se offense, such as the group boycotts allegedly engaged in by Defendants, she is relieved of the additional burden of proving that competitive harm occurred within a specifically defined market before she is entitled to prevail on her section 1 claim. In the alternative, Ginzburg argues that if the rule of reason applies, the restraints at issue in this case are "naked restraints", which again do not require an elaborate market analysis to demonstrate such an agreement's anticompetitive effect. If a market analysis is required, Ginzburg

claims that the relevant product market is "neonatology services provided within the Memorial Healthcare System." (Plaintiffs' Further Response to Defendants' Motion for Summary Judgment, Instrument No. 136 at 31) and the relevant geographic market includes only Memorial

██ Finally, Ginzburg asserts that Defendants' concerted conduct proximately caused the decline in her practice and will ultimately result in her elimination as a competitor from the relevant market. Conversely, Defendants contend that Ginzburg cannot prevail on her claims for numerous reasons, first, because, absent proof of an antitrust injury, Ginzburg lacks standing to assert an antitrust claim or, in the alternative, Ginzburg has failed to show that Defendants' allegedly unlawful conduct resulted in an unreasonable restraint of trade. However, before the Court proceeds to its analysis of this defense or the merits of Ginzburg's claims, it must "identify the market that defendants' alleged unlawful conduct affects." *Pontius v. Children's Hosp.*, 552 F.Supp. 1352, 1365 (W.D.Pa.1982). Ginzburg proffered the testimony of her expert economist, Dr. Carol Bennett ("Bennett"), to prove that the "relevant product market is intensive care neonatological and perinatal services," that is, the provision of neonatology services in a Level III nursery, and that the "relevant geographical market is Memorial Hospital Southwest." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 2 at 3). Defendants claim this market definition is, as a matter of law, insufficient and therefore, cannot be used by the Court for purposes of its analysis. The Court agrees.

### A. Market Definition

The relevant market is "the geographic and product/service area that is affected by the questioned activity or operation, and it is in that market where the affect upon competition must be assessed." 1 LOUIS ALTMAN, CALLMANN ON UNFAIR COMPETITION, TRADE-MARKS AND MONOPOLIES, § 4.31 (4th ed.1997). Thus, a proper market definition "requires both a geographic and product dimension." *Bhan*, 929 F.2d at 1413. The plaintiff bears

the burden of proving of establishing a suitable market definition. *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 724, 726 (3d Cir.1991).

### 1. Product Market

██ The relevant product market is "composed of products that have reasonable interchangeablity for purposes for which they are produced." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1011, 100 L.Ed. 1264 (1956). "The outer boundaries of the product market are drawn in terms of the presence of substitutes to which consumers will turn in response to price changes...and the ability of other existing producers or new entrants to expand output from their present facilities or to build new capacity...." *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir.1983); *see also R.D. Imports Ryno Industries, Inc. v. Mazda Distrib.*, 807 F.2d 1222, 1225 (5th Cir.1987) (finding that product market consists of "[g]oods that consumers view as substitutes for other goods"). Factors to be considered in assessing the limits of the relevant product market include "price, use and qualities." *Tunis Bros.*, 952 F.2d at 723.

Ginzburg defines the relevant product market as "intensive care neonatological and perinatal services." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 2, Bennett Aff. at 3). Bennett describes the practice of neonatal-perinatal medicine as involving "the care and treatment of the newborn for the first two to three months of life, as well as the care of the baby during a complicated pregnancy and/or delivery." *Id.* at 6. Bennett, however, is also careful to distinguish between the services offered by a specialist such as a neonatologist and a general practitioner or pediatrician by stating that "the specialties of neonatology and perinatology are orders of magnitude more complicated than well-baby care." *Id.* Based on Bennett's testimony, Ginzburg argues in her second response to Defendants' motion for summary judgment, that the intensive care neonatological and perinatal services which Bennett contends constitute the relevant product market must

be performed in a Level III nursery. (Plaintiffs' Further Response to Defendants' Motion for Summary Judgment, Instrument No. 136 at 31). Ginzburg then argues that since both extensive training and specialized knowledge are required to perform such services, there is no other reasonable substitute or alternative currently available on the market to consumers in need of the type of care administered in a Level III nursery. (Plaintiffs' Further Response to Defendants' Motion for Summary Judgment, Instrument No. 136 at 31).

Defendants', on the other hand, define the product market more broadly and claim that the relevant product market is comprised of neonatology services in general and not simply one component—specifically, the treatment of infants in level III nurseries—of the "bundle of physician services associated with the diagnosis and treatment of newborn children." (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90, Ex. H, Lynk Aff. ¶ 12). In support of their contention, Defendants' have submitted data showing that Ginzburg has treated more babies in the Level I nursery at Memorial than she has in the other two nurseries combined. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90, Ex. C). Defendants' further claim that pediatricians can offer comparable care for a Level I newborn and thus, their services may be considered as a reasonable substitute for the type of treatment neonatologists provide. (Defendants' Motion for Summary Judgment, Instrument No. 89 at 23).

The relevant market, however, " 'is the narrowest market which is wide enough so that products [or services] from adjacent areas or from other producers [service providers] in the same area cannot compete on substantial parity with those included in the market.' " *Pontius v. Children's Hosp.*, 552 F.Supp. 1352, 1365 (W.D.Pa.1982) (quoting L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST § 12 (1977)). The Court finds that there is sufficient evidence in the record from which a reasonable person could conclude that certain services a neonatologist offers, particularly the care provided an infant in a level II or III nursery, cannot be

performed by a pediatrician. Therefore, for purposes of this motion, the Court will assume that the relevant product market are those specialized services offered by neonatologists that pediatricians are not qualified to perform. The Court will also assume that access to a Level III nursery is essential to the provision of such care.

**2. Geographic Market**

■ "The geographic dimension of the relevant market encompasses 'the area of effective competition' in which the particular product or its reasonably interchangeable substitutes are traded." *Hornsby*, 714 F.2d at 1393 (quoting *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 988 (D.C.Cir.1977) (citations omitted)); *see also Collins v. Assoc. Pathologists, Ltd.*, 676 F.Supp. 1388, 1404 (C.D.Ill. 1987) ("The definition of a relevant geographic market varies from case to case depending on the type of product and the geographic characteristics of an area, but the relevant geographic market must identify the area of effective competition that the defendant encounters when it offers its product or services for sale."). In other words, " '[t]he relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks.' " *Tunis Bros.*, 952 F.2d at 726 (quoting *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir.1984)); *see Hornsby*, 714 F.2d at 1393 (stating that the geographic market is "a measure of the capacity of competing firms to sell beyond their immediate location, and 'determines whether a particular product market is' ") (quoting II P. AREEDA & D. TURNER, ANTITRUST LAW ¶ 522 (1978)). "Consequently, the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." *Tunis Bros.*, 952 F.2d at 726.

Ginzburg claims that the relevant geographic market is "neonatology services provided within the Memorial Healthcare System." (Plaintiffs' Further Response to Defendants' Motion for Summary Judgment, Instrument No. 136 at 31). Bennett provides the following as her reasons for this

conclusion: (1) that due to "the high degree of medical responsibility demanded by the nature of the product," the neonatology is prevented from practicing in a "wide but diffuse geographic area"; (2) that doctors like Ginzburg who do not hold academic positions at Baylor College of Medicine or the University of Texas Health Science Center are precluded from practicing at two county hospitals offering Level III services; (3) that Memorial occupies a unique position in the market for neonatology services because it is located on the outskirts of Houston's congested highways and because Memorial offers doctors "greater control over their patients—both medically and financially"; and (4) that two other hospitals offering level III neonatal care are already or will be in the future affiliated with Memorial—Hermann Hospital is scheduled to fully merge with Memorial Healthcare System in late 1997 and St. Joseph Hospital is owned by the Sisters of Charity of the Incarnate Word Health Care System which is "economically...deeply intertwined with Memorial". (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109 at Ex. 2, Bennett Aff. at 10–19).

This evidence, however, is insufficient as a matter of law to establish a relevant geographic market because Bennett's testimony completely "fails to address a critical legal question: where could consumers of the product...*practicably turn for alternative sources of the product.*" *Morgenstern v. Wilson,* 29 F.3d 1291, 1296 (8th Cir.1994) (emphasis in original); *see also Tampa Elec. Co., v. Nashville Coal Co.,* 365 U.S. 320, 331–32, 81 S.Ct. 623, 630, 5 L.Ed.2d 580 (1961) (stating that the relevant geographic market was "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies"). Bennett's testimony instead analyzes the relevant market from Ginzburg's viewpoint. "Evidence of the *competitor's perspective* is not sufficient...because a geographic market is determined by inquiring into 'the commercial realities faced by *consumers.*'" *Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340, 345 (8th Cir.1995) (emphasis in original) (quoting *Eastman Kodak Co. v. Image Tech. Serv., Inc.,* 504 U.S. 451, 452–56, 112 S.Ct. 2072,

2076, 119 L.Ed.2d 265 (1992)) (citation omitted). "'What we really need to know is the extent to which people from the immediate area can readily turn to *alternative* sellers....'" *Id.* (quoting Herbert Hovenkamp, Federal Antitrust Policy § 3.6d (1994)). No such evidence was produced by Ginzburg in this case.

Moreover, "every court that has addressed this issue has held or suggested that, absent an allegation that the hospital is the only one serving a particular area or offers a unique set of services, a physician may not limit the relevant geographic market to a single hospital." *Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 877 (3d Cir.1995). *See, e.g., Oksanen v. Page Mem'l Hosp.,* 945 F.2d 696, 709 (4th Cir.1991) (stating that the plaintiff's "narrow market definition violates a fundamental tenet of antitrust law that the relevant market must encompass the realities of competition" and although defendant's hospital may be where the plaintiff prefers to practice, "this preference alone does not justify excluding other hospitals...from the relevant market"); *Collins v. Assoc. Pathologists, Ltd.,* 844 F.2d 473, 480 n. 5 (7th Cir. 1988) (stating that plaintiff physician was "slicing the geographic market much too thin" in limiting the market to one hospital); *Seidenstein v. Nat'l Med. Enter., Inc.,* 769 F.2d 1100, 1106 (5th Cir.1985) (finding that there was no evidence to prove that the hospital should be "recognized as a separate and distinct market, or that unique services or facilities existed there"); *Dos Santos v. Columbus–Cuneo–Cabrini Med. Ctr.,* 684 F.2d 1346, 1353 (7th Cir.1982) (stating that "we have reason to doubt whether the relevant market can be sliced so small as to embrace only a single hospital"); *Flegel v. Christian Hosp. Northeast–Northwest,* 804 F.Supp. 1165, 1174 (E.D.Mo.1992) (finding that the plaintiff's market definition—limiting the relevant geographic market to one hospital—lacked any "reasonable legal or factual basis").

While Ginzburg does not argue that Memorial is the only hospital offering neonatology services in Harris County, she does attempt to establish that Memorial is a "unique" hospital, thereby entitling it to, for

this reason, recognition as a separate and distinct market. To support such a proposition, Bennett testifies, without providing any corresponding proof, that "[t]he congestion of Houston's highways makes [Memorial's] location attractive to both patients and doctors." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 2, Bennett Aff. at 18). Bennett also claims that "[f]or pregnant women, including Medicaid patients, the Memorial System advertises that it offers the highest level of neonatal services, plus a map showing convenient locations outside the 610 loop." *Id.* Bennett's conclusory allegations, however, absent specific supporting facts, lack probative value and are therefore insufficient, standing alone, to avoid summary judgment. *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.,* 670 F.2d 575, 577 (5th Cir.1982); *see also Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985). Finally, Ginzburg herself raises the possibility of a broader geographic market by arguing that Defendants' conduct may preclude her from seeking employment in other Harris County hospitals. Thus, Ginzburg fails to meet her burden of producing competent evidence to establish the propriety of her proposed market definition—"[t]his is particularly true when [Ginzburg herself] practice[s] in a geographic market larger than the one proposed for the relevant geographic market..." *Flegel,* 804 F.Supp. at 1174.

Defendants' expert, William Lynk ("Lynk"), on the other hand, submitted data analyzing "the area from where Memorial draws most of its patients" to determine "the other hospitals at which [this group of patients] also receive[s] (or could receive) neonatal hospital inpatient services." (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90, Ex. H, Link Aff. at 12–15). Link found that "90 percent of Memorial's neonatal gross revenue comes from 60 zip codes." *Id.* at 12. Link then determined where these patients spending the most on neonatal care at Memorial "could go as easily as they currently go to Memorial". *Id.* at 15. Link testified that hospitals offering neonatal care within the 60 zip code area and hospitals immediately beyond this area but which were as accessible as Memorial

were, due to their geographic proximity, reasonable alternative care options for Memorial patients. *Id.* at 15–16. Link concluded that the competitively relevant geographic area was thus comprised of both Harris and Fort Bend counties and included ten other hospitals equipped with Level III nurseries. Absent any competent, contradictory proof from Ginzburg, the Court will presume for purposes of this motion for summary judgment, that the relevant geographic market is, at a minimum, the Harris and Fort Bend counties.

## B. Standing

Standing to bring an antitrust claim is governed by section 4 of the Clayton Act which provides a private right of action to "any person who shall be injured in his business or his property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. Despite this broad language, however, standing to pursue an antitrust suit under Section 4 exists only if a plaintiff can show: (1) an injury-in-fact, that is an injury to the plaintiff proximately caused by defendants' conduct; (2) an antitrust injury; and (3) proper plaintiff status, which assures that other parties are not better situated to bring suit. *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir.1997).

Defendants argue that Ginzburg has not suffered, as a direct result of any unlawful conduct engaged in by Defendants, an "antitrust injury" which is remediable by the antitrust laws. Defendants further argue that Ginzburg is not the proper plaintiff to bring this suit; instead, Defendants claim, the better plaintiffs are the patients who, according to Ginzburg, have suffered a diminished quality of care since Defendants have, allegedly through the implementation of a variety of group boycotts, effectively precluded Ginzburg from treating patients at Memorial.

### 1. Antitrust injury

An antitrust injury has been defined by the United States Supreme Court in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* as an:

injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations...would be likely to cause."

429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)); *see also Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 110 S.Ct. 1884, 1894–95, 109 L.Ed.2d 333 (1990) (stating that a plaintiff can recover on an antitrust claim only where the loss "stems from a competition-reducing aspect or effect of the defendant's behavior"); *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1433 (9th Cir.1995) (holding that the plaintiff, in order to prove an antitrust injury, must show that his loss "flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming form acts that do not hurt competition"). However, because "the purpose of antitrust law is the promotion of consumer welfare," the court must analyze the antitrust injury question from the perspective of the consumer. *Reazin v. Blue Cross and Blue Shield of Kansas,* 899 F.2d 951, 960 (10th Cir.1990). Thus, in order to show that he suffered an antitrust injury, "an antitrust plaintiff must prove that the challenged conduct affected the prices, quantity or quality of goods or services and not just his own welfare." *Angelico v. Lehigh Valley Hospital, Inc.,* 984 F.Supp. 308, 312–13 (E.D.Pa.1997)(citing *Mathews v. Lancaster General Hospital,* 87 F.3d 624, 641 (3d Cir.1996).)

Recently, the Fifth Circuit, in *Doctor's Hospital of Jefferson v. Southeast Medical Alliance, Inc.,* discussed the type of proof the plaintiff needed to produce in order to show that he suffered an antitrust injury. 123 F.3d 301 (5th Cir.1997). In this case, the defendant, Southeast Medical Alliance ("SMA"), denied the plaintiff, Doctor's Hospital of Jefferson ("Doctor's Hospital"), membership into its preferred provider organiza-

tion ("PPO") while simultaneously admitting into the alliance the plaintiff's chief competitor, Jefferson Parish Hospital Service ("Jefferson Parish"). *Id.* at 303–04. Doctor's Hospital sued, claiming that SMA and Jefferson Parish conspired to restrict competition by excluding Doctor's Hospital from the PPO. *Id.* In addressing the issue of whether Doctor's Hospital had standing to sue, the court stated that "the antitrust laws do not require a plaintiff to establish a market-wide injury to competition", which often is a component of substantive liability, "as an element of standing". *Id.* at 305. "To require summary judgment proof of the substantive violations as a prerequisite to antitrust injury and therefore standing to sue...is inefficient and confusing." *Id.* at 306. The court instead held that "antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace." *Id.* at 305. The court found that Doctor's Hospital's "alleged losses and competitive disadvantage because of its exclusion from SMA fall easily within the conceptual bounds of antitrust injury." *Id.* Although the court did not engage in a marketwide analysis, the court was careful to mention in conclusion that the underlying purpose of the standing inquiry is to "ensure[ ] that the plaintiff's demand for relief ultimately serves the purposes of the antitrust law to increase consumer choice, lower prices and assist competition, not competitors." *Id.* at 305–06; *see also Rebel Oil,* 51 F.3d at 1433 ("[A]n act is deemed anticompetitive under the Sherman Act only when it harms both allocative efficiency and raises the prices of goods above competitive levels or diminishes their quality").

Assuming that Defendants did unlawfully conspire to destroy Ginzburg's practice at Memorial and achieved this objective by collectively refusing to refer patients to her, by declining to provide cross-coverage for her patients or by blacklisting her, Ginzburg's alleged injury—her inability to successfully practice medicine at Memorial—still does not constitute an antitrust injury. Unlike *Doctor's Hospital,* Ginzburg's alleged exclusion did not decrease consumer choice or quality of care. Nor did it increase consum-

er prices. Although Ginzburg claims that her virtual exclusion from medical collegiality at Memorial has resulted both in a reduction in patient choice and in a decline in the quality of care rendered, no evidence has been produced that such harm to competition has actually occurred in this case. Moreover, the decline in Ginzburg's patient referrals and annual earnings does not constitute an actionable antitrust injury.

### a. Patient Choice

 Unlike SMA's conduct in *Doctor's Hospital*, which allegedly "weaken[ed] [Doctor's Hospital] as a competitor for Jefferson Parish" and reduced consumer choice, Defendants' conduct in this case has had no similar impact on Ginzburg's ability to compete. *Doctor's Hospital*, 123 F.3d at 304–06. Ginzburg contends that Defendants' have attempted to drive her from the marketplace so that they can take her share of Memorial's neonatology patients. Such a claim, however, is insufficient to show that Ginzburg has suffered "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp.*, 429 U.S. at 488–89, 97 S.Ct. at 697.

First, Ginzburg has not, as she maintains, been precluded by Defendants from seeing any patient requesting her services or from acquiring new patients on her own. Not only does she continue to treat patients at Memorial, she also holds staff privileges at ten Harris County hospitals. Consequently, Ginzburg has always had the option of transferring her patients to any of these hospitals as well as seeking referrals from physicians practicing at such locations or at any other hospital equipped to care for neonates. *See Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir.1996) (finding that the restriction of a physician's privileges to practice at a particular hospital did not constitute an antitrust injury because the physician's ability to practice medicine was not extinguished); *Leak v. Grant Med. Center*, 893 F.Supp. 757, 763 (S.D.Ohio 1995) (stating that the plaintiff did not suffer an antitrust injury although he was denied privileges at a particular hospital because he retained staff privileges at two other local hospitals and was therefore still "fully able to compete with

other physicians in his field"); *see also Robles v. Humana Hosp. Cartersville*, 785 F.Supp. 989, 998 (N.D.Ga.1992) (holding that the plaintiff did not have standing in a case where there was no evidence that the plaintiff's inability to practice medicine at the only hospital in the county had any anticompetitive impact on the quality, quantity or price of services provided at that hospital); *Cooper v. Amster*, 645 F.Supp. 46, 47 (E.D.Pa.1986) (dismissing case for lack of subject matter jurisdiction because the plaintiff could not prove that he suffered any injury as a result of the defendants' refusal to refer patients to him; "plaintiff is not being precluded from doing anything by any of the defendants. He may find his own patients..."); *cf. Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir.1992) (holding that refusals to provide coverage for another physician's patients neither restrains nor injures competition).

Ginzburg does attempt to argue that Defendants interfered with her ability to compete at these other locations by "prejudic[ing] [Ginzburg's] applications for provider status with insurance companies inquiring as to her skills [and] prejudic[ing] her renewal of privileges at other hospitals". (Plaintiffs' Motion for Summary Judgment, Instrument No. 109 at 10). Ginzburg's evidence, however, does not support these accusations. Ginzburg produced a letter from BlueCross BlueShield of Texas and a letter addressed to Hurwitz from Bellaire Hospital, requesting evaluations of Ginzburg's performance at Memorial. (Plaintiffs' Motion for Summary Judgment, Instrument No. 109, Ex. 25). The letter from BlueCross BlueShield was returned by Memorial with a handwritten notation which read that "[w]e are unable to respond to the attached ques. For further info please contact the Cred. Cmt. Chair." *Id.* Similarly, Hurwitz responded to the Bellaire letter by writing, "I do not feel comfortable to give you an evaluation of this Physician." *Id.* Contrary to Ginzburg's assertions, neither Memorial's or Hurwitz' responses indicate that Ginzburg was "prejudiced" in her efforts to obtain provider status with BlueCross BlueShield or staff privileges at Bellaire. Nor can an inference of wrongdoing or deliberate interference with Ginzburg's status at BlueC-

ross BlueShield or Bellaire be drawn from replies, such as Memorial's or Hurwitz', merely declining to offer further comment.

 Moreover, "the fact that a hospital's decision [to revoke a physician's staff privileges] caused a disappointed physician to practice medicine elsewhere does not of itself constitute a antitrust injury." *Oksanen*, 945 F.2d at 708; *see also Bellam v. Clayton County Hosp. Auth.*, 758 F.Supp. 1488, 1494 (N.D.Ga.1990) ("Thus reduced to its essentials, plaintiff['s] Sherman Act claims rest not on a showing of anti-competitive impact, but merely on the fact that [he] is [a] disappointed competitor who will now be forced to provide [obstetric] services elsewhere."). "If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action." *Oksanen*, 945 F.2d at 708.[1]

Even absent consideration of Ginzburg's options to practice at other hospitals, Ginzburg still fails to produce evidence that competition has been threatened or that patient choice options have diminished due to Defendants' conduct. Ginzburg testifies that there has been "an increased number of NICU [intensive care] patients at the Hospital" and that "Defendants, the Cox–Downey partnership, and Moore have each expanded their practices in 1996 by hiring associates to help with their increased patient loads at Memorial." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 1 Ginzburg Aff. at 19).

Cox also testified that "[i]n 1989, there were 8 neonatologists on staff at [Memorial]". At the current time there are 11 physicians with privileges to practice neonatology at [Memorial]. This is the largest number of neonatologists in terms of the membership of the Harris County Medical Society and the neonatologist members of [Memorial's] medical staff since I have had privileges at Memorial. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90 at Ex. A, Cox Aff.). Thus, by Ginzburg's own admission and by Cox's statement, patient choice at Memorial has actually increased. *See Angelico v. Lehigh Valley Hosp.*, 984 F.Supp. 308, 313–14 (E.D.Pa.1997) (holding that the plaintiff, a cardiothoracic surgeon, had no standing to pursue claim that he was coerced to resign his staff privileges because "there [was] no evidence that there [were] any fewer cardiothoracic surgeons practicing and performing coronary artery bypass graft (CABG) procedures in the Lehigh Valley since plaintiff left the marketplace"); *Robles*, 785 F.Supp. at 998 (stating that although the plaintiff was no longer able to practice at the defendant's hospital, the evidence showed that the hospital added two more doctors to its staff after the plaintiff left, thus proving that "patients have more of a choice concerning which doctor to visit and that [the hospital] is a more competitive hospital with the addition of the new doctors").

### b. Quality of Care

 Although Ginzburg argues that "quality of care [administered to] Medicaid and uninsured babies diminished as referrals were diverted away from Dr. Ginzburg and toward the conspirators," the evidence she submits, however, does not indicate that this is what in fact occurred. (Plaintiffs' Further Response in Opposition to Defendants' Mo-

---

1. Arguably, Ginzburg may, if the Board decides to deny her application for reappointment, show that her removal from the medical staff at Memorial had an adverse affect on competition if she could also show that such decision negatively impacted her status at the ten other hospitals at which she currently has privileges, resulting in her exclusion from the profession as a whole. *See Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 820 (11th Cir.1990)(stating that "a negative decision by one hospital could be 'tantamount to excluding a doctor from the profession as a whole'") (quoting Blumstein & Sloan, *Antitrust and Hospital Peer Review*, LAW & CONTEMP. PROBS., Spring 1988, at 9, 15). Competition may indeed be threatened as the number of competitors is unnaturally decreased. However, although the revocation of a doctor's privileges may reduce competition by decreasing the number of doctors in a certain specialty, this act alone will not give rise to an antitrust violation. Proof of concerted action is still required, which Ginzburg will be unable to produce with regard to the denial of her application for reappointment because that decision will be made by the Board unilaterally. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984). *see also Robinson*, 521 F.Supp. at 907 ("If the [hospital] discontinues its business relationship with a [doctor] for its own independent reasons, no concerted activity has occurred.").

tion for Summary Judgment, Instrument No. 136 at 1, 29). In support of her position, Ginzburg offers a letter written by Vicki Lucas, Director of Women's and Children's Services at Memorial, stating that "Dr. Ginzburg has consistently higher charges and a longer average length of stay...as compared to the [other] 3 neonatologists that utilize our NICU." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 9). A greater expenditure of resources, however, is not necessarily synonymous with a higher quality of care.

The Lucas' letter also states that "Dr. Ginzburg excessively orders pneumograms which will result in approximately $120,000 in charges to the hospital that are not reimbursable." *Id.* In response to Lucas' allegations that her use of pneumograms was "excessive", Ginzburg testifies that "[d]uring the time period about which Ms. Lucas complained (1994), in 1994 I ordered 25 total studies, 23 of which were abnormal, which justified my clinical judgment that such tests were necessary. In 1995, I ordered 24 such tests. Only 3 were normal and 1 was borderline." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 1, Ginzburg Aff. at 18). Due to lack of comparative information, this evidence is insufficient, in and of itself, to establish a differential in quality of care caused solely by Ginzburg's effective exclusion from patient treatment at Memorial. Ginzburg may have been justified in ordering the pneumograms, however, there is no corresponding statistics or data showing that the patients of the other neonatologists received lesser care under the same circumstances. Neither is there evidence to show that the more selective employment of pneumograms or the utilization of alternate less, expensive treatment methods negatively impacted the quality of care administered by Memorial physicians who, perhaps, may not have used pneumograms as readily as Ginzburg. Contrary to Ginzburg's assertions, the evidence indicates that there were satisfactory substitutes for the pneumogram. In a transcript, submitted by Ginzburg, of a taped conversation between Lucas, Ginzburg, and Moore in which the three were discussing establishing uniform standards for the use of pneumo-

grams, Lucas stated that "Memorial City [Hospital] does not do any pneumograms. If there is a kid that falls within the presumptive criteria, they do home monitoring but they do not order a pneumogram." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 2 at 5).

Further, Lucas' statement does not demonstrate that pneumogram were only ordered by Ginzburg and not ordered by other physicians in situations where they were warranted by the symptoms of the baby. In fact, Moore stated in that same discussion with Lucas and Ginzburg that "[w]e are talking about uniform criteria for all the patients. If I have a problem about a child, and I say I don't feel right about this baby, one clinical parameter or another, I will order that test." *Id.* at 6. Nor does the letter establish that Ginzburg's patients somehow received better care under Ginzburg's supervision than they would under the supervision of another physician. Lucas' statement merely indicates that Lucas had a dispute with the manner in which Ginzburg utilized Hospital resources, which provides no insight into the type of care received by Ginzburg's patients or whether such patients have been deprived of a higher quality of care since Ginzburg's effective elimination from the practice of neonatology at Memorial.

In addition, the Lucas letter represents that "[Ginzburg] also insists on ordering a Sechrist Ventilator for her patients...Her refusal to use Bear Cubs which are comparable has resulted in approximately $9,200 in unnecessary rental fees." (Plaintiffs' Response to Defendant's Motion for Summary Judgment, Instrument No. 109, Ex. 9). Ginzburg claims that the Bear Cub ventilators are "dangerous, have been recalled 4 times in 10 years, and are not standard of care" and that "Memorial wished for doctors to continue using the Bear Cub because that is what they own. They have refused to purchase the standard of care ventilator, Sechrist, in spite of my requests that they do so." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 1, Ginzburg Aff. at 19). If it was Memorial's standard practice to use such

allegedly inferior equipment, Ginzburg's presence on or absence from the medical staff would have no impact on the use or availability of the preferred ventilator. Moreover, the evidence produced by Ginzburg shows that the Bear Cub could be used safely if certain precautions were taken. (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 13).

Finally, Ginzburg offers her own testimony that the caliber of nurses on Memorial's nursing staff was questionable and that their overall performance deficient. (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 1, Ginzburg Aff. at 6–7). Ginzburg claims that she "attempted to enlist the help of the nursing administration, hospital administration and medical staff officers in eliminating dangerous nursing practices." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109 at 9). Again, Ginzburg's concerns regarding the capabilities of Memorial's nursing staff has no relevance as to whether the quality of care at Memorial has diminished any by Ginzburg's alleged exclusion from competition at Memorial and her resulting inability to acquire new patients or to properly treat her existing patients there. Further, according to Ginzburg, the level of care provided by Memorial's nursing staff did not improve even in spite of her efforts. In fact, Ginzburg claims that most of her verbal complaints were ignored and her formal written complaints were "whitewashed, announced to be without merit, and used to trigger a peer review action against [her]." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109 at 7). Ironically, Ginzburg's criticism of the Hospital, its equipment and its staff, only indicate that Ginzburg is apparently doing her patients a disservice by remaining at Memorial when she could offer better care, which in turn would both enhance her ability as a competitor and would increase the quality of care available to patients in need of such treatment, were she to conduct her practice at a better equipped, better operated facility. See Leak, 893 F.Supp. at 763 (stating that if the plaintiffs' practice of medicine was as

they claimed, more cost effective than methods utilized by other physicians, "then both the hospitals at which plaintiffs have privileges and plaintiffs have a competitive advantage over the defendant anesthesiologists", who allegedly engaged in a group boycott by denying plaintiffs staff privileges at the defendants' hospital).

### c. Patient Referrals and Annual Earnings

■ Ginzburg also claims that Defendants' conduct resulted in a dramatic decrease in her own annual earnings. Specifically, Ginzburg states that "my patient load has dropped significantly since 1994, my intra-hospital referring sources have dwindled to almost nothing, a fact which has crippled my ability to obtain new patients." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 109, Ex. 1 at 19). She further states that "[m]y share of the most economically profitable market...has been severely damaged. And all of these reductions in my earning are taking place in the face of an increased number of NICU patients at the Hospital." *Id.*

■ Antitrust concerns, however, are not implicated by an individual physician's loss of income or patient referrals. *Baglio v. Baska,* 940 F.Supp. 819, 829 (W.D.Pa.1996) (stating that the "physician's loss of patient referrals and loss of income did not establish an antitrust injury") (citing *Huhta v. Children's Hospital of Philadelphia,* 1994 WL 245454 (E.D.Pa.1994), *aff'd* 52 F.3d 315 (3d Cir. 1995)). "The focus of the antitrust laws is on promoting competition. As a result, a plaintiff cannot demonstrate [an antitrust injury] merely by showing that [a restraint of trade] caused him an economic injury." *Oksanen,* 945 F.2d at 708 (citations omitted). Moreover, the antitrust laws were enacted for the "protection of competition and not competitors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962); *Rea v. Hospital Corporation of America,* 892 F.Supp. 821, 834 (N.D.Tex. 1993) ("The fact that a competitor's income may have been reduced by someone's conduct, does not mean that competition was impermissibly restrained."). Absent evi-

dence that Defendants' conduct threatened competition or adversely affected consumer choice, the financial losses allegedly sustained by Ginzburg are "merely injur[ies] to [herself] as a competitor[], damages which are not actionable under the antitrust laws." *Purgess v. Sharrock,* 806 F.Supp. 1102, 1106–07 (S.D.N.Y.1992). Ginzburg's proof of personal harm, therefore, is insufficient to demonstrate an antitrust injury.

### 2. Proper or Appropriate Plaintiff

Defendants also argue that even if Ginzburg could demonstrate that she suffered an antitrust injury, she still cannot prove that she is most appropriate party to bring this suit. The Court agrees. In determining whether a particular plaintiff is a proper or appropriate plaintiff, courts generally consider the following factors: (1) the directness of the asserted injury, that is the chain of causation between the injury and the alleged unlawful restraint; (2) the nature of the harm; (3) the speculativeness of the alleged injury; (4) the difficulty of identifying damages and apportioning them among direct and indirect victims of the alleged conduct, in order to avoid duplicative recoveries and (5) the causal connection between the violation and the harm. *Associated Gen. Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983); *Todorov,* 921 F.2d at 1448; *Volvo No. America Corp. v. Men's International Professional Tennis Council,* 857 F.2d 55, 66 (2d Cir.1988). In the atypical antitrust case, such as the case at hand, "[s]tanding analysis can be most helpful... if the court assumes an antitrust violation has occurred and then determines whether the plaintiff has suffered injury-in-fact, is a proper plaintiff and has experienced 'antitrust injury' from the violation." *Doctor's Hospital,* 123 F.3d at 306.

Assuming, in accordance with *Doctor's Hospital,* that the injury the antitrust laws address—the decrease in quality of care provided to Memorial patients and the reduction in patient choice options—has in fact occurred, then it would be Memorial's patients and the third party payors, not Ginzburg, who are actually injured by Defendants' allegedly unlawful conduct. *Todorov,* 921 F.2d at 1455 (finding that the plaintiff, a physician who was denied staff privileges, was not the proper party to bring suit and stating that "[i]f the [defendants] are acting anticompetitively and are charging an inflated price, then the patients, their insurers or the government, all of whom are interested in ensuring that consumers pay a competitive price, may bring an action to enjoin such practice"); *Baglio,* 940 F.Supp. at 830 (stating that where the plaintiff alleged that the defendant's conduct adversely affected competition by increasing the cost of pathology services, the most appropriate plaintiff to bring suit was the "patients and the larger payor community who would be directly injured by the alleged antitrust violations"). "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party...to perform the office of a private attorney general." *Associated Gen. Contractors of California,* 459 U.S. at 542, 103 S.Ct. at 910–11.

In addition, both Memorial's patients and the third party payors have a strong, non-conflicted interest in assuring that neither quality of care nor patient choice options at Memorial are diminished by anticompetitive conduct. These parties who would be directly impacted by any factors resulting in a decrease of quality of care would have brought such an action were it justified. In contrast, while Ginzburg claims that her motivation is purely for consumer protection, she has an indisputable business interest at stake—that of retaining her privileges to see patients at Memorial and in gaining a greater percentage of referrals currently directed towards her competitors. In fact, if the situation at Memorial were as Ginzburg claims, then Ginzburg would be treating her patients elsewhere if she were solely motivated by concern for patient welfare. *See Robles,* 785 F.Supp. at 998 (finding that a physician who had been denied privileges to practice at defendants' hospital was not an efficient enforcer of the antitrust laws because the patients and the government had a stronger interest in ensuring that prices and services remain at competitive levels and because the

physician's only interest "is that he be allowed to compete in [the relevant market], not that patients receive quality services at competitive prices"). Moreover, Ginzburg has not alleged any connection between the injury she did suffer—the decline in her practice at Memorial and the corresponding decrease in her annual earnings—and a lessening of competition. Thus, due to the lack of evidence establishing either an antitrust injury or that Ginzburg is the proper plaintiff to redress the harm allegedly caused by Defendants' conduct, Ginzburg does not have standing to assert an antitrust claim.

## C. Concerted Activity

 Even assuming Ginzburg had standing to bring the claims asserted herein, Ginzburg fails to produce evidence sufficient to demonstrate that Defendants in fact had conspired to eliminate her from competition at Memorial. "The very essence of a section 1 claim...is the existence of an agreement." *Alvord–Polk v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir.1994). Therefore, to prevail on a section 1 claim, the plaintiff must submit evidence that "reasonably tends to prove that the [Defendants] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Monsanto*, 465 U.S.at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980)); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2740–41, 81 L.Ed.2d 628 (1984) (" '[U]nity of purpose or a common design or understanding or a meeting of the minds in an unlawful arrangement' must exist to trigger section 1 liability.") (quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). Proof of concerted action also requires evidence of a relationship between two or more legally distinct persons or entities. *Copperweld*, 467 U.S. at 769, 104 S.Ct. 2731, 2740–41, 81 L.Ed.2d 628 (1984).

### 1. Capacity to Conspire

In *Copperweld Corporation v. Independence Tube Corporation*, the United States Supreme Court held as a matter of law that a parent corporation does not have the capacity to conspire with its wholly-owned subsidiary. 467 U.S. at 777, 104 S.Ct. at 2745. In reaching this conclusion, the Court noted that "[i]n any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit," which in turn threatens competition by "reduc[ing] the diverse directions in which economic power is aimed" and "increas[ing] the economic power moving in one particular direction." *Copperweld*, 467 U.S. at 769, 104 S.Ct. at 2740. However, the Court found that combinations between parties that have a complete unity of interest, such as a parent corporation and its wholly owned subsidiary do not "raise the antitrust dangers that § 1 was designed to police" because there is "no sudden joining of economic resources that had previously served different interests." *Copperweld*, 467 U.S. at 769, 771, 104 S.Ct. at 2740, 2742. Such conduct, the Court continued, is more akin to unilateral activity, which is not regulated by Section 1. *Copperweld*, 467 U.S. at 775–76, 104 S.Ct. at 2743–44. Likewise, "[t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals ." *Copperweld*, 467 U.S. at 769, 104 S.Ct. at 2740.

Defendants argue that Memorial's medical staff was acting as its agent in connection with the alleged eight sham peer review investigations, thereby rendering them incapable, under *Copperweld*, of conspiring with the Hospital. Defendants also claim that "where the hospital, through its bylaws, retains the final decision-making authority concerning a physician's application for medical staff privileges, there can be no conspiracy." (Defendants' Motion for Summary Judgment, Instrument No. 89 at 18).

 Defendants are correct in their contention that the requisite concerted activity would be lacking both in a situation where a physician was acting as a hospital's agent and in a situation, such as in the instant case, where a hospital's board of trustees retained the ultimate authority to deny an application for reappointment or for renewal of staff

privileges. *See Oksanen,* 945 F.2d at 702 (stating that with regard to decision making by a medical staff who had been delegated the authority to conduct peer review proceedings, " 'the medical staff operated as an officer of the corporation would in relation to the corporation' ") (quoting *Weiss v. York Hosp.,* 745 F.2d 786, 817 (3d Cir.1984)); *Mathews v. Lancaster Gen. Hosp.,* 883 F.Supp. 1016, 1038–39 (E.D.Pa.1995) (stating that because the hospital's board of trustees has the sole authority to restrict a physician's staff privileges, "the recommended restrictions on plaintiff's privileges were a unilateral action of the Board"). However, the injuries about which Ginzburg complains, are not simply limited to the harm she sustained as a result of the allegedly improper peer review proceedings or the damage she would suffer if her staff privileges are in fact revoked. Rather, Ginzburg contends that she has suffered actionable antitrust injuries independent of any decision by the Board to deny her application for reappointment and not solely on account of the sham peer review proceedings. For example, Ginzburg has raised question of whether members of medical staffs can conspire with each other. The Second, Fourth and Eleventh Circuits have held that members of hospital medical staffs are capable of conspiring with one another in view of their separate and possibly competitive private economic interests. *See Capital Imaging Associates, P.C. v. Mohawk Valley Med. Assoc., Inc.,* 996 F.2d 537, 544 (2d Cir.1993), *Oksanen,* 945 F.2d at 706; *Bolt,* 891 F.2d at 819. Because the Court finds that Ginzburg has alleged circumstances under which *Copperweld* may not preclude the finding of a conspiracy, the Court will assume for purposes of this motion, that Defendants had the capacity to conspire and will instead consider the sufficiency of the evidence proffered by Ginzburg in support of such conspiracy.

## 2. Evidence of a Conspiracy

■ The United States Supreme Court, in *Monsanto Company v. Spray–Rite Service Corporation,* established the standard for determining whether the plaintiff's evidence is sufficient to permit the inference of a conspiracy in an antitrust case. 465 U.S. at 764,

104 S.Ct. at 1471. The Court stated that "the correct standard is that there must be evidence that tends to exclude the possibility of independent action....That is, there must be direct or circumstantial evidence that reasonably tends to prove that [the defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 768, 104 S.Ct. at 1473. However, "mere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence from which to infer an anitcompetitive conspiracy..." *Cooper v. Forsyth County Hospital Authority, Inc.,* 789 F.2d 278, 281 (4th Cir.1986).

■ To prove that a conspiracy between the Defendants existed in this case, Ginzburg relies on inferences which she claims may be drawn from evidence of Defendants' words, conduct and the manner in which Defendants treated Ginzburg over the course of Ginzburg's tenure with Memorial. Ginzburg testifies that eight sham peer review proceedings were initiated against her by Defendants solely in effort to discredit her. Ginzburg also testifies that Hurwitz discouraged other physicians from referring her patients and that Cox and Moore begged Eastham to remove Ginzburg from the medical staff. In addition, Ginzburg states that Lukas told her that she should "take her patients and get out." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Instrument No. 136 at 20). Ginzburg claims that "pretextual charges made by both the Neonatologist Defendants and Hospital personnel in the peer review process", as well as the expressed desire of the other staff members to have her removed is sufficient evidence to support an inference of a conspiracy.

Defendants', on the other hand, argue that Ginzburg has neither established that their actions were taken in furtherance of a conspiracy nor negated the possibility that Defendants acted independently. Defendants submit evidence which indicates that Memorial had legitimate concerns with regard to the manner in which Ginzburg treated the nursing staff, other physicians and her patients. (Appendix to Defendants' Motion for

Summary Judgment, Instrument No. 91, Ex. W). Defendants also produced evidence showing that inquiry into the degree of competence exhibited by Ginzburg was not unjustified. Dr. Michael Stanley, Medical Director Neonatology, Harris Methodist Fort Worth concluded, after conducting an independent review of Ginzburg's medical charts, that there were "several problems with [Ginzburg's] practice patterns", among which were Ginzburg's over utilization of laboratory studies, her excessive ordering of blood transfusions and her unavailability during critical periods in infant treatment. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 92, Ex. V). In addition, there is other evidence which raises questions regarding the quality of care rendered by Ginzburg. (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Ex. W). Finally, Defendants' deny that they acted in concert to remove Ginzburg from Memorial's medical staff. Instead, Defendants claim that it was Ginzburg's perceived inability to work with others, her abruptness in handling patients and their families and her differing practicing methods that caused them to avoid dealing with her. Such decisions, Defendants claim, were reached independently of one other.

■ Antitrust law "limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Evidence of conduct, which is "as consistent with permissible competition as with illegal conspiracy, does not, without more, support even an inference of conspiracy." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. Moreover, courts are "reluctant to draw inferences of an antitrust conspiracy from ambiguous circumstantial evidence in cases where the challenged activity promotes competition." *Mathews,* 87 F.3d at 640. Thus, "when the defendant puts forth a plausible, procompetitive explanation for his actions, [the court] will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred; the plaintiff must produce more probative

evidence that the law has been violated." *Todorov,* 921 F.2d at 1456.

■ Courts have routinely found that, when properly conducted, peer review actions, such as those taken in the instant case, "generally enhance competition and improve the quality of medical care." *Mathews,* 87 F.3d at 624; *see also Oksanen,* 945 F.2d at 709 ("[T]he peer review process, by policing competence and conduct of doctors, can enhance competition."); *Weiss v. York Hospital,* 745 F.2d 786, 821 n. 60 (3d Cir.1984) ("[I]t seems obvious that by restricting staff privileges to doctors who have achieved a predetermined level of medical competence, a hospital will enhance its reputation and the quality of medical care it delivers. Thus, such action is pro-competitive."). Moreover, "[c]orrective action against a physician does not violate the antitrust laws if the physician's peer reviewers has legitimate medical reasons to believe that the physician provided substandard care." *Willman v. Heartland Hospital East,* 34 F.3d 605, 611 (8th Cir.1994). Ginzburg provides no evidence, other than her conclusory assertions, that the actions taken by Defendants in connection with the 8 peer review proceedings were pretextual. Such unsupported allegations, are insufficient, standing alone, to defeat an otherwise properly supported summary judgment motion. *Id.* at 612.

Furthermore, the Court finds that, in light of the conflicting evidence regarding the quality of Ginzburg's care and her ability to work with other staff members, Defendants' conduct in declining to provide cross-coverage for Ginzburg's patients, in refusing to refer Ginzburg patients and in conducting peer review investigations regarding Ginzburg's level of competence, is as consistent with the lawful motive of enhancing patient care as it is with the anticompetitive motive of reducing competition. Thus, absent "more probative evidence that the law has been violated", Ginzburg's evidence does not create an inference of an antitrust conspiracy. *Todorov,* 921 F.2d at 1456.

Finally, Ginzburg's contention that Memorial's motivation for her removal was based on its desire to continue its practice of reducing costs by using allegedly inferior equip-

ment and by employing nurses who lacked proper training—an objective which could be frustrated by Ginzburg's unwillingness to refuse to refrain from filing complaints regarding such deficiencies in Hospital operations—is inconsistent with the reality faced by a hospital in a highly competitive marketplace where quality of care is generally the determinative factor for patients in making hospital selection decisions. In fact, Eastham testified that "[w]e simply have no incentive to provide a lower quality of care. To do so would probably result in fewer deliveries or nursery care at our Hospital because patients, obstetricians, neonatologists and pediatricians would simply go to another hospital." (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Ex. W, Eastham Aff. at 12). Eastham also testified that

Memorial Hospital Southwest strives to provide high quality care. We believe that we do. We have been continuously accredited by the Joint Commission on Accreditation of Healthcare Organizations since 1969. In 1997 we received accreditation with commendation and were awarded a...score of 98 out of a possible 100 points, placing Memorial Hospital Southwest in the top 3% of accredited hospitals in the United States.

*Id.* Finally, Eastham stated that if Ginzburg, as she claims, "has excellent skills and is well respected by physicians on our medical staff then we would expect that should she leave the hospital the patients who would otherwise have been treated by her within [Memorial] would be referred to Dr. Ginzburg at another hospital." *Id.* at 8. Eastham concluded that "as a consequence, there would be no financial incentive for Memorial to terminate Dr. Ginzburg's medical staff privileges." *Id.*

When, as in this case, "the [plaintiff's] had no rational economic motive to conspire, and [when] their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Matsushita,* 475 U.S. at 596–97, 106 S.Ct. at 1361. There must be other evidence "sufficiently unambiguous to permit a trier of fact to find that [the defendants] con-

spired...despite the absence of any apparent motive to do so." *Id.* at 596, 106 S.Ct. at 1362. The Court finds that, in the instant case, there is no such evidence in the record. Rather, the facts before the Court indicate that Defendants' conduct was as consistent with permissible, legitimate business behavior as it was with an illegal conspiracy. Thus, Ginzburg is unable to meet her burden of proving that Defendants acted in concert to eliminate her as a provider of neonatology services at Memorial and as a result, Ginzburg's claim must fail.

### D. Rule of Reason

■ Ginzburg argues that the group boycotts engaged in by Defendants are per se violative of the Sherman Act, rendering further inquiry into the actual harm caused by such restraints or the business justification proffered for their use unnecessary. The Court, however, disagrees and instead concludes that Ginzburg's claims should be analyzed under the rule of reason. Ginzburg's claim would also fail under such analysis because there is insufficient evidence in the record to establish that Defendants' conduct resulted in an unreasonable restraint of trade.

■ A group boycott is not, contrary to Ginzburg's contentions, always a per se violation. In *Northwest Wholesale Stationers v. Pacific Stationery & Printing,* the United States Supreme Court "defin[ed] the category of concerted refusals to deal [group boycotts] that mandate per se condemnation." 472 U.S. 284, 294, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985). In so doing, the Court held that "the decision to apply the *per se* rule turns on 'whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output...or instead one designed to increase economic efficiency and render markets more, rather than less, competitive.'" *Id* at 289–90, 105 S.Ct. at 2617 (quoting *Broadcast Music, Inc v. Columbia Broad. System, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979)) (citation omitted). Thus, "[t]he mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are

predominantly anticompetitive." *Id.* at 298, 105 S.Ct. at 2621; *see also Mackey v. Nat'l Football League,* 543 F.2d 606, 619 (8th Cir. 1976) ("To outlaw certain types of business conduct merely by attaching the 'group boycott' and *'per se'* labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed.").

Based on the reasoning set forth in *Northwest Wholesale Stationers,* the per se approach has been said to apply only in cases "in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *Indiana Fed'n of Dentists,* 476 U.S. at 458, 106 S.Ct. at 2018. In *Goss v. Memorial Hospital System,* the Fifth Circuit declined to apply the per se rule to a physician's claim that the hospital for which he worked and its medical staff conspired to deprive him of his staff privileges. 789 F.2d 353, 355 (5th Cir. 1986). The court held that finding a restraint to be unreasonable as a matter of law was inappropriate in a case where the plaintiff had failed to show that the hospital had " 'market power or exclusive access to an element essential to effective competition.' " *Id.* at 355 (quoting *Northwest Wholesale Stationers,* 472 U.S. at 289–90, 105 S.Ct. at 2621). The court also noted that the plaintiff's "challenged expulsion from the staffs of Memorial and Sharpstown [Hospitals] through the use of the hospitals' internal review procedure [did] not imply anticompetitive state of mind" because such review procedures are "necessary to insure that hospital staff members are competent medical practitioners." *Goss,* 789 F.2d at 355. Moreover, courts have generally been reluctant to:

> hold that a group of physicians who decide that they do not want to refer patients to a particular surgeon, because they doubt his qualifications, have committed a per se violation of the Sherman Act. Because actions on the part of hospitals and physicians, which might resemble group boycotts, may well be mandated by an ethically grounded concern for patients' wellbeing...such behavior, in the medical service industry, should be analyzed in terms of the rule of reason.

*Pontius,* 552 F.Supp. at 1366; *see Weiss,* 745 F.2d at 820 (stating that if the challenged conduct is premised on public service or ethical norms, a rule-of-reason analysis should be used); *see, e.g., Oksanen,* 945 F.2d at 708–09 (analyzing the denial or revocation of staff privileges under the rule of reason).

 Ginzburg has offered no evidence to justify the treatment of Defendants' alleged group boycotts as per se violations of the Sherman Act. Not only has Ginzburg failed to show that Memorial possessed market power, she also has not proven that Memorial had "unique access to a business element" which Ginzburg needed in order to effectively compete in the relevant marketplace. The evidence in the record, in fact, appears to contradict Ginzburg's assertions. Texas Department of Health statistics submitted by Defendants show that "Memorial Hospital Southwest has less than a 10% market share of the number of neonatal intermediate care beds (Level III) within ten miles of Memorial Hospital Southwest." (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 91, Ex. W, Eastham Aff. at 11). In addition, Lynk testified that "within the two county area—Harris and Fort Bend counties—Memorial's share of neonatal intermediate care beds is 5.10 percent (18 beds), and of intensive care beds is 5.81 percent (ten beds)." (Appendix to Defendants' Motion for Summary Judgment, Instrument No. 90, Ex. H, Link Aff. at 18). Moreover, Defendants each maintain that their behavior was not anticompetitive. Instead, they claim, that they were motivated by concern for patient well being and that all their actions relating to Ginzburg were taken and their recommendations and statements made in furtherance of quality health care. As in *Goss,* this Court finds that both the peer review process and physicians' decisions not to either refer patients to a particular doctor or to provide cross-coverage for that doctor's patients are not actions which are inherently anticompetitive; rather, such conduct may in fact enhance competition by ensuring that hospital standard's for physician competence are upheld.

Ginzburg nonetheless argues that the per se rule applies in this case because Defen-

dants' allegedly procompetitive justification for their conduct is merely a pretext for Defendants' real motivation—to permanently exclude her from competition at Memorial. The Supreme Court in *Northwest Wholesale Stationers*, addressed this precise issue, stating that if the defendant's "actions were not substantially related to the efficiency-enhancing or procompetitive purposes that otherwise justify the cooperative's practices, an inference of anticompetitive animus might be appropriate." 472 U.S. at 297 n. 7, 105 S.Ct. at 2621 n. 7. However, the Court also stated that "such an argument is appropriately evaluated under the rule-of-reason analysis." *Id.* Thus, Court finds that, notwithstanding Ginzburg's arguments, Ginzburg's claims should be evaluated under the rule of reason. *See Jackson v. Radcliffe*, 795 F.Supp. 197, 206 (S.D.Tex.1992) (applying rule of reason test to physician's contention that the termination of his contract with a Harris County hospital was an illegal restraint of trade); *Marin v. Citizens Mem'l Hosp.*, 700 F.Supp. 354, 359 (S.D.Tex.1988) (court applied rule of reason to physician's claim that the hospital for which he worked and its medical staff formed a group boycott to "reduce or eliminate [plaintiff's] 'competitive potential'") (citation omitted).

### 1. Reasonableness of Restraint

██ To determine the legality of a restraint under the rule of reason, the plaintiff must show that the "defendant's actions amounted to a conspiracy against the market—a concerted attempt to reduce output and drive up prices or otherwise reduce consumer welfare." *Consolidated Metal Products, Inc. v. American Petroleum Inst.*, 846 F.2d 284, 292–93 (5th Cir.1988). "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps promotes competition or whether it is such as may suppress or even destroy competition." *National Society of Prof'l Eng'r v. U.S.*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). Thus, to sustain her burden, the plaintiff must produce evidence showing that the defendants played a significant role in the relevant market, thereby creating the risk that their conduct could adversely affect competition. *Consolidated*

*Metal*, 846 F.2d at 294–95; *see Oksanen*, 945 F.2d at 709.

██ Inquiry into the defendants' market power is not necessary, however, when the anticompetitive effects of a given practice are readily apparent. *Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 431–36, 110 S.Ct. 768, 780–82, 107 L.Ed.2d 851 (1990); *Flegel v. Christian Hosp., Northeast–Northwest*, 4 F.3d 682, 688 (8th Cir.1993) ("'Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.'") (citations omitted). The plaintiff's submission of such evidence establishing the existence of market power or actual detrimental effects on competition results in the burden shifting back to the defendants to demonstrate that their conduct instead had a pro-competitive impact on competition. To overcome this showing by the defendants, the plaintiff must next prove that "any legitimate objectives can be achieved in a substantially less restrictive manner." *Bhan*, 929 F.2d at 1413. Ultimately, the Court will weigh "the harms and benefits to determine if the behavior is reasonable on the balance." *Id.*

### 2. Market Power or Actual Detrimental Effects

██ In determining whether a particular defendant possesses market power within the relevant market, the following factors are considered: "the strength of the competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." *Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir.1994). "Most significant . . . is the defendants' share of the relevant market." *Id.* Ginzburg, however, has failed to submit any evidence demonstrating that the Defendants' possessed market power. In fact, the evidence in the record shows that Memorial maintains, at

most, only a 10% share of the neonatal intermediate care beds in Harris county and less than a 6% share of such beds in Harris and Fort Bend counties combined. This low market share implies, absent other indications of market power, that Memorial lacks the market power necessary to have a controlling effect on competition. *See U.S. v. Eastman Kodak, Co.,* 63 F.3d 95, 109 (2d Cir.1995) (holding that only a 36 percent market share supported the finding that the defendant lacked market power).

Moreover, Ginzburg has failed to produce evidence to establish that the complained of conduct actually had an adverse affect on competition. As previously discussed, there has been no showing that either quality of care or patient choice options has diminished since the implementation of the alleged unlawful group boycotts. Thus, without proof that Defendants' conduct had either a negative impact on competition or potential for such, Ginzburg cannot prevail on her Section 1 claim. Defendants' motion for summary judgment will therefore be granted. In light of this ruling, the Court does not find it necessary to address Defendants' contention that they are entitled to immunity under HCQIA or the release executed by Ginzburg in April of 1995.

### IV. Conclusion

Accordingly, Defendants' motion for summary judgment is **GRANTED**.