Richard J. ANGELICO, M.D.,

v.

LEHIGH VALLEY HOSPITAL, INC., St. Luke's Hospital of Bethlehem Easton Hospital, Panebianco–YIP Heart Surgeons, Bethlehem Cardiothoracic Surgical Assoc., P.C.

No. CIV. A. 96–CV–2861.

United States District Court,
E.D. Pennsylvania.

Oct. 28, 1997.

John M. Elliott, Henry F. Siedzikowski, Timothy S. Kerr, Elliott Reihner Siedzikowski & Egan, Blue Bell, PA, for Plaintiff Richard J. Angelico, M.D.

Richard F. Stevens, Stevens & Johnson, Allentown, PA, for Defendant Lehigh Valley Hosp.

Edward C. Mengel, Jr., White & Williams, Philadelphia, PA, for Defendant Saint Luke's Hosp.

Reeder R, Fox, Duane Morris & Heckscher, Philadelphia, PA, for Defendant Easton Hosp.

Donald H. Lipson, Tallman, Hudders & Sorrento, Allentown, PA, for Defendant Panebianco–YIP.

Fred B. Buck, Rawle & Henderson, Philadelphia, PA, for Defendant Bethlehem Cardiothoracic.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

By way of their joint motion for summary judgment, Defendants seek the entry of judgment in their favor as a matter of law on plaintiff's antitrust claims and request that this Court decline to exercise supplemental jurisdiction and dismiss plaintiff's remaining state law claims. For the reasons which follow, defendants' motion shall be granted.

## Background

Plaintiff is a cardiothoracic surgeon who practiced in the Lehigh Valley[1] from 1986 until he resigned his privileges[2] at St. Luke's Hospital in Bethlehem, PA on March 5, 1994. (Dep. of Richard J. Angelico, M.D., dated 8/8/96, 21–22, 104).

By his complaint, plaintiff contends that defendants Lehigh Valley Hospital ("LVH"), St. Luke's Hospital ("SLH"), Panebianco–Yip ("PB–Y") and Bethlehem Cardiothoracic Surgical Associates ("BCSA") collectively had a sufficient share of the coronary artery by-pass graft surgical market in the greater Lehigh Valley (an average of 78% in 1992 and 1993) to control it and that they conspired to eliminate plaintiff as a competitor "through various predatory acts." (Complaint, ¶s 13, 27–31). These "predatory acts" consisted of, *inter alia,* the alleged circulation between defendants of allegedly defamatory and derogatory remarks concerning plaintiff's interpersonal and patient care skills and, in the case of St. Luke's, willfully failing to provide plaintiff with competent medical and clinical support for his patients thereby allegedly coercing him to resign his staff privileges. (Complaint, ¶s 33–41, 45–46, 51, 54).

Following his resignation from St. Luke's,[3] Dr. Angelico contends the alleged conspiracy continued with the result that his courtesy privileges at LVH were improperly terminated for failure to pay staff dues in a timely fashion and that defendants' effectively "blackballed" him from all three defendant hospitals by denying and causing the denial of his applications for privileges at Easton Hospital and to reinstate his privileges at Lehigh Valley and St. Luke's. (Pl.'s Dep., 138).

As a result of these activities, plaintiff has been unable to secure privileges at any of the defendant hospitals. (Complaint, ¶s 56–81, 93). Plaintiff submits that defendants thus engaged in a group boycott and exclusive dealing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and that defendants have a completely dominating monopoly share of the market in violation of the Sherman Act, § 2. Plaintiff thus seeks trebled damages under § 4 of the Clayton Act, 15 U.S.C. § 15.

By orders dated July 17 and August 16, 1996, the Court approved and adopted the parties' stipulations for entry of a case management order limiting the first phase of discovery in this case to the issues of antitrust standing and injury. Under those orders, once the parties had completed discovery on these issues, the court would entertain summary judgment motions, with discovery on all other issues to remain stayed until a ruling could be issued on any such motions filed. Defendants thereafter filed their joint motion for summary judgment on February 26, 1997 in which they (naturally) assert that as plaintiff lacks the standing necessary to pursue his antitrust claims, this case should be dismissed in its entirety.

## STANDARDS APPLICABLE TO SUMMARY JUDGMENT MOTIONS

The legal standards to be followed by the district courts in resolving motions for summary judgment are outlined in Fed.R.Civ.P. 56. Subsection (c) of that rule states, in pertinent part,

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

1. As alleged in paragraph 11 of plaintiff's complaint and as admitted in defendants' respective answers thereto, "the Lehigh Valley area is generally bounded by the cities of Allentown, Bethlehem and Easton and consists of the counties of Lehigh and Northampton in Pennsylvania."

2. For a surgeon, staff privileges equate with the right to perform surgery at a given hospital. Thus, if a surgeon is without privileges at any hospital, he is effectively foreclosed from practicing his chosen specialty.

3. Although at the time he first began practicing in the Lehigh Valley, Dr. Angelico had full active privileges in surgery at Lehigh Valley Hospital, Allentown Hospital, Sacred Heart Hospital and subsequently St. Luke's Hospital, by March 1994, plaintiff only had full active privileges at St. Luke's and courtesy privileges at Lehigh Valley Hospitals. (Pl.'s Dep., 22–23, 39–40. 104, 138). As he had only courtesy privileges at Lehigh Valley Hospital, plaintiff could not perform more than twelve surgical procedures there per year. (Pl.'s Dep., 22–23, 39–40, 104, 138).

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Under this Rule, the court is required to look beyond the bare allegations of the pleadings to determine if they have sufficient factual support to warrant their consideration at trial. *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287 (D.C.Cir.1988), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). *See Also: Aries Realty, Inc. v. AGS Columbia Associates,* 751 F.Supp. 444 (S.D.N.Y.1990). The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, the court must view the facts in the light most favorable to the party opposing the motion and all reasonable inferences from the facts must be drawn in favor of that party as well. *U.S. v. Kensington Hospital,* 760 F.Supp. 1120 (E.D.Pa.1991); *Schillachi v. Flying Dutchman Motorcycle Club,* 751 F.Supp. 1169 (E.D.Pa.1990). When, however, "a motion for summary judgment is made and supported [by affidavits or otherwise], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, may be entered against [it]." Fed.R.Civ.P. 56(e).

■ It has been held that the question of whether or not a particular practice of restraint promotes or suppresses competition is not one that can typically be resolved

through summary judgment proceedings. *Ratino v. Medical Service of District of Columbia,* 718 F.2d 1260 (4th Cir.1983). *See Also, Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) ("Summary judgment should be used sparingly in antitrust litigation where motive and intent play leading roles, proof is largely in the hands of the alleged conspirators and hostile witnesses thicken the plot.")

The Supreme Court, however, has also recognized that summary judgment remains a vital procedural tool to avoid wasteful trials and may be particularly important in antitrust litigation to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–588, 593–594, 106 S.Ct. 1348, 1355–57, 1359–60, 89 L.Ed.2d 538 (1986); *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Assoc.,* 996 F.2d 537, 541–42 (2d Cir.1993).

### *DISCUSSION*

■ Plaintiff bases this lawsuit on Sections 1 and 2 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. § 15. These sections of the Sherman Act effectively outlaw conspiracies and the making of agreements or contracts to restrain free trade and the development of or attempts to develop monopolies. Section 4 of the Clayton Act, in turn, grants the right to maintain a private cause of action to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). As these sections imply, standing and antitrust injury are essential elements to maintaining an action for damages thereunder. *See, e.g., Cargill, Inc. v. Monfort, Inc.,* 479 U.S. 104, 110, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986).

■ Although the two concepts of antitrust standing and injury are closely linked and often confused, they are nevertheless distinct. While standing cannot be established without an antitrust injury, the existence of an antitrust injury does not automatically confer standing. *Sharp v. United*

*Airlines, Inc.,* 967 F.2d 404, 406 (10th Cir. 1992). In addition, while harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, the court must make a further determination of whether the plaintiff is a proper party to bring a private antitrust action. *Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 535, n. 31, 103 S.Ct. 897, 907, n. 31 74 L.Ed.2d 723 (1983). *See Also, Barton & Pittinos, Inc. v. Smithkline Beecham Corp.,* 118 F.3d 178 (1997).

The Supreme Court itself often does not distinguish between antitrust standing and antitrust injury and has long avoided establishing black letter rules. *In Re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144, 1165 (3rd Cir.1993); *Sharp v. United, supra,* at 406. The Court has, however, outlined the following factors to be considered in evaluating standing questions: (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages. *In Re Lower Lake Erie,* at 1165–66; *Sharp v. United,* at 406–407.

Succinctly stated, to establish antitrust standing, the plaintiff must prove (1) that he has suffered an antitrust injury, and (2) that he is the most efficient enforcer of the antitrust laws. *Huhta v. Children's Hospital of Philadelphia,* 1994 WL 245454 (E.D.Pa.1994), citing, *inter alia, In Re Lake Erie, supra; Alberta Gas Chemicals, Ltd. v. E.I. Du Pont De Nemours & Co.,* 826 F.2d

1235, 1240 (3rd Cir.1987). Antitrust injury consists of (1) harm of the type the antitrust laws were designed to prevent; and (2) an injury which flows from that which makes defendants' acts unlawful. *Id. See Also, Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 429 (3rd Cir.1993).

Because antitrust law aims to protect competition, not competitors, the court must analyze the antitrust injury question from the viewpoint of the consumer. *Mathews v. Lancaster General Hospital,* 87 F.3d 624, 641 (3rd Cir.1996), citing *Alberta Gas Chemicals Ltd. v. E.I. Du Pont De Nemours & Co.,* 826 F.2d 1235, 1241 (3rd Cir.1987). An antitrust plaintiff must prove that the challenged conduct affected the prices, quantity or quality of goods or services and not just his own welfare. *Id.,* citing *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 728 (3rd Cir.1991).

In this case, plaintiff is pursuing three theories for recovery: price fixing, monopolization and group boycott. As a group boycott is a *per se* violation [4] of the Sherman Act, plaintiff asserts that he therefore has standing *a fortiori.* We disagree.

The question of whether a plaintiff has standing to raise antitrust claims under *any* theory is a threshold issue. Whether there was or was not a *per se* violation of the Sherman Act (such as is often the case where a group boycott exists) is irrelevant. *Balaklaw v. Lovell,* 14 F.3d 793, 800 (2nd Cir.1994); *Baglio v. Baska,* 940 F.Supp. 819, 828 (W.D.Pa.1996). *See Also: Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1419 (7th Cir.1989) ("The mere presence of a substantive Sherman Act, § 1 violation, *per se* or not, does not by itself bestow on any plaintiff a private right of action for damages.") and *Newman v. Universal Pictures,* 813 F.2d 1519, 1522–23 (9th Cir.1987),

---

4. *Per se* violations involve agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality. *Per se* illegal restraints on trade such as boycotts and price fixing do not require proof of market power. *Lie v. St. Joseph Hospital of Mount Clemens, Mich.,* 964 F.2d 567, 569 (6th Cir.1992), citing *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) and *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 432–436, 110 S.Ct. 768, 780–781, 107 L.Ed.2d 851 (1990).

("[A]lthough the *per se* rule relieves plaintiff of the burden of demonstrating an anticompetitive effect, which is assumed, it does not excuse a plaintiff from showing that his injury was caused by anticompetitive acts.")

We therefore now examine the evidence presented to determine the standing question. In so doing, we note that the bulk of the evidence produced by the parties in this case consists of reports and affidavits from plaintiff's proposed expert and "rebuttal" expert witnesses, defendants' proposed expert witnesses, and the depositions of plaintiff and his expert witness. Examining all of this evidence in the light most favorable to plaintiff, we accept for purposes of this motion that the product market in which plaintiff was competing until March, 1993 was that of cardiothoracic surgical services and that the relevant geographic market was that of the greater Lehigh Valley consisting of Carbon, Monroe, Lehigh, Northampton and Schuylkill Counties. (Podrat Dep., 31–34, 43–48 [5]; Pl's Dep., 159–169; Pl's Exhibit "Q").

Here, it is clear that Plaintiff was unable to obtain privileges at any of the hospitals in this market following his resignation from the staff at St. Luke's Hospital and that he suffered at the very least a significant loss in income. (Pl's Dep., 114–127, 137–149, 154–156; Pl's Exhibits "N" and "O"). As the above-cited case law makes clear, however, an injury to Dr. Angelico personally does not confer standing upon him without a showing that his absence from the relevant product and geographic markets injured competition and/or the consumers of cardiothoracic surgical services in these markets. Stated otherwise, there must be evidence of a negative impact on prices, quantity or quality of cardiothoracic surgical services in the Lehigh Valley market to show *antitrust injury* and not just injury to one competitor. *Mathews, supra,* at 641; *Tunis,* 952 F.2d at 728.

It is on this measure of proof that plaintiff's case fails. For one, there is no evi-

dence that there are any fewer cardiothoracic surgeons practicing and performing coronary artery bypass graft (CABG) procedures in the Lehigh Valley since plaintiff left the marketplace. (Podrat Dep., 40–41, 51–54). At the time that Dr. Angelico resigned his privileges at St. Luke's Hospital, the Panebianco–Yip, Bethlehem Cardiothoracic and Theman–Hoffman surgical groups and Doctors Toonder and Khindri were all practicing cardiothoracic surgery in the Lehigh Valley marketplace. (Pl's Dep., 104–106). Following plaintiff's departure from the market, the Bethlehem Cardiothoracic and Panebianco–Yip groups continued to have active privileges at the three subject hospitals as did Doctors Cavarrochi, Alprin, Halrpin, Erdelyan and Morgan. (Pl's Dep., 106–110).

There is also no evidence that the quality of cardiothoracic surgical care has been reduced or in any way compromised by Dr. Angelico's departure. Indeed, by his own testimony, plaintiff had sufficient confidence in Drs. Theman and Hoffman to request them to take over his surgical patients when he decided to resign from the staff at St. Luke's. (Pl's Dep., 118–120).

Plaintiff likewise testified that in his opinion, the surgeons in the Panebianco–Yip group are good quality and that he simply did not know whether the other cardiothoracic surgeons who continued or began practicing in the Lehigh Valley area after he resigned were better or worse surgeons than he was. (Pl's Dep., 115–122, 147).

Plaintiff's antitrust expert also stated that he was not qualified to render an opinion on the quality of surgical care available to patients in the Lehigh Valley area either before or after Dr. Angelico's departure from the market. (Podrat Dep., 199–206). To the contrary, examining only the raw data on mortality and ASG (admission severity group) supplied to him from the Pennsylvania Health Care Cost Containment Council (HC4) and Mediqual, plaintiff's expert found

---

5. These definitions of product and geographic markets are supported by the affidavit of plaintiff's "rebuttal" expert, John Beyer. (Pl's Exhibit "P"). Defendants' anti-trust expert, Barry Harris in turn, more narrowly defines the product market as being that of the professional or technical component of cardiac surgery services and the geographic market as consisting of Lehigh Valley Hospital, Easton Hospital and St. Luke's Hospital. (Defendants' Exhibit "D").

only that Dr. Angelico had equal or better mortality results in the aggregation of either of the other providers at St. Luke's or Lehigh Valley Hospitals. (Podrat Dep., 78–82, 111–112, 130–132, 235–238, 252–260). As plaintiff's expert acknowledged, however, most of the other individual cardiothoracic surgeons with whom plaintiff was competing had mortality rates at about the same level as Dr. Angelico. (Pl's Exhibits "J" and "K"; Podrat Dep., 237–238).

We similarly find there to be insufficient evidence of a negative impact on price to withstand defendants' motion for summary judgment. On this point, plaintiff testified that while he believed he was a "lot cheaper" than the other cardiothoracic surgeons in the Lehigh Valley market, he does not know what he charged for his services nor is there any evidence on this record as to how plaintiff's charges compared to other surgeons' charges, including the defendant groups. (Pl's Dep., 89–90, 122–125).

Plaintiff's antitrust expert also stated that he has no knowledge either of what plaintiff or other cardiothoracic surgeons charged for their services. (Podrat Dep., 55–56, 139–142). Instead, while both plaintiff and his expert testified that the market has been harmed because he, as the lowest cost provider had been excluded, their testimony was based upon a comparison of the charges for cardiothoracic surgery levied by the defendant **hospitals**—not surgeons. (Pl's Dep., 127–134; Podrat Dep., 54–55, 63–65). In fact, plaintiff's expert stated that a change in Dr. Angelico's charges or prices for surgery would not have a significant impact on the market. (Podrat Dep., 141–145).

Interestingly, the record further reveals that, in reality, it is neither the hospital nor the individual surgeon but the payor (i.e., insurance company, HMO, Medicare) that determines the cost of a cardiothoracic surgi-cal procedure and that the payment which is ultimately received by both the hospital and the physician is often dependent upon such factors as the type of insurance which a patient has, the patient's development of complications, need for additional services, the length of time spent in the hospital and the rate of reimbursement for each type of procedure set by the payor. (Pl's Dep., 90–101, 123–129; Podrat Dep., 57–62, 145–149, 167–169, 188–192).[6]

Moreover, the evidence in this case demonstrates that, following plaintiff's departure from the Lehigh Valley cardiothoracic surgical market, while there was a slight increase in mortality rates and costs for these services between 1994 and 1996 at Easton Hospital, costs *decreased* at Lehigh Valley Hospital. Similarly, there was a slight increase in the mortality rate at St. Luke's Hospital during this time period, but the cardiothoracic surgical costs there decreased. (Podrat Dep., 66–73, 83–85, 138, 232–233; Pl's Exhibit "L").

Indeed, Dr. Angelico's and his expert's own testimony and the evidence produced demonstrate that the market was not harmed by plaintiff's departure. Based upon this record, this Court therefore cannot find that plaintiff suffered the type of injury that the antitrust laws were designed to prevent nor can we find that Dr. Angelico is the most efficient enforcer of those laws. *See, In Re Lake Erie,* and *Huhta,* both *supra.* We are therefore forced to conclude that plaintiff does not possess the requisite standing necessary to pursue his antitrust claims. Defendants' motion for summary judgment shall therefore be granted. Plaintiff's remaining claims are state law claims over which we decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, this action shall be dismissed in its entirety.

An appropriate order follows.

---

**6.** Mr. Podrat also opined that a negative impact may be inferred from Dr. Angelico's absence in that the data from HC4, Mediqual and St. Luke's Hospital suggested that his patients historically were discharged more quickly with fewer complications and at the expected mortality rate such that plaintiff and the institution(s) at which he practiced could have been attractive to existing and prospective payors, specifically managed care plans. (Podrat Dep., 121–124, 143–149, 229–230). This opinion notwithstanding, plaintiff's expert freely admitted that he has no idea whether any managed care companies actually so considered Dr. Angelico or whether they used him "as a benchmark" to negotiate provider service contracts with any institution. (Podrat Dep., 125).

## ORDER

AND NOW, this 28th day of October, 1997, upon consideration of Defendants' Motion for Summary Judgment and Plaintiff's Response thereto, it is hereby ORDERED that, for the reasons set forth in the foregoing Memorandum, Defendants' Motion is GRANTED and this action is DISMISSED.