

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-16-1999

# Angelico v. Lehigh Valley Hosp

Precedential or Non-Precedential:

Docket 97-1927

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Angelico v. Lehigh Valley Hosp" (1999). *1999 Decisions.* Paper 203.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/203

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 16, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1927

RICHARD J. ANGELICO, M.D.,
        Appellant

v.

LEHIGH VALLEY HOSPITAL, INC.; SAINT LUKE'S
HOSPITAL OF BETHLEHEM PENNSYLVANIA; EASTON
HOSPITAL; PANEBIANCO-YIP HEART SURGEONS;
BETHLEHEM CARDIOTHORACIC SURGICAL
ASSOCIATES, P.C.; BRIAN M. PETERS, ESQ.;
POST & SCHELL, P.C.

Caption amended pursuant to 2/10/98 order

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. No. 96-cv-02861)
District Judge: The Honorable J. Curtis Joyner

ARGUED December 4, 1998

BEFORE: SLOVITER, NYGAARD, and
WOOD,* Circuit Judges.

(Filed: July 16, 1999)

_____

* The Honorable Harlington Wood, Jr., Circuit Judge of the United States
Court of Appeals for the Seventh Circuit, sitting by designation.

Henry F. Siedzikowski, Esq. (Argued)
Elliott, Reihner, Siedzikowski
 & Egan
925 Harvest Drive
Union Meeting Corporate Center V
Blue Bell, PA 19422

 Attorney for Appellant

Richard F. Stevens, Esq. (Argued)
Stevens & Johnson
740 Hamilton Mall
Allentown, PA 18101

Edward C. Mengel, Jr., Esq.
David E. Edwards, Esq.
White & Williams
One Liberty Place, Suite 1800
Philadelphia, PA 19103

Wayne A. Mack, Jr.
Duane, Morris & Heckscher
4200 One Liberty Place
Philadelphia, PA 19103-7396

Donald H. Lipson, Esq.
Tallman, Hudders & Sorrentino
1611 Pond Road
The Paragon Centre, Suite 300
Allentown, PA 18104

Mark H. Scoblionko, Esq.
Scoblionko, Scoblionko, Muir
 & Bartholomew
40 South 5th Street
Allentown, PA 18101

Frederick B. Buck, III, Esq.
Rawle & Henderson
One South Penn Square
The Widener Building
Philadelphia, PA 19107

          Jeffrey G. Weil, Esq. (Argued)
          Dechert, Price & Rhoads
          1717 Arch Street
          4000 Bell Atlantic Tower
          Philadelphia, PA 19103

           Attorneys for Appellees

OPINION OF THE COURT

NYGAARD, Circuit Judge.

Dr. Richard Angelico appeals a summary judgment for the defendants, Lehigh Valley Hospital, St. Luke's Hospital of Bethlehem, Pennsylvania, Easton Hospital, the Panebianco-Yip Heart Surgeons, and Bethlehem Cardiothoracic Surgical Associates ("Bethlehem") (collectively, the "hospital defendants") on his antitrust claims. The District Court held that Angelico did not have standing to assert antitrust claims because he had not shown an injury to competition. We will reverse and remand for further proceedings.

Angelico also appeals the dismissal of his due process claims under 42 U.S.C. S 1983 against Brian M. Peters, Esq., his law firm Post & Schell, P.C., and the firm's client, Lehigh Valley Hospital (collectively, the "attorney defendants"). Finally, he appeals the District Court's sanction in the form of attorney's fees for Peters. We will affirm the dismissal and attorney's fees award.

I. Facts and Procedural History

Angelico is a cardiothoracic surgeon. The three hospitals are located in the Lehigh Valley area in Pennsylvania. Panebianco-Yip and Bethlehem are physician practice groups specializing in thoracic and cardiothoracic surgery in the same area. Angelico began his career in the Lehigh Valley area with a group of cardiovascular specialists and became a member of the active medical staff of Lehigh Valley Hospital, where he performed cardiothoracic surgery. Just over a year later, Angelico left his original practice

3

group, joined Panebianco-Yip as that practice group's primary surgeon, and acquired active privileges at St. Luke's.

In 1989, Angelico resigned from Panebianco-Yip and established his own practice. He maintained his privileges at both Lehigh Valley and St. Luke's until January of 1991, when he requested that his active privileges at Lehigh Valley be reduced to "courtesy" privileges, which allowed him to perform only a limited number of operations there each year. He maintained his courtesy privileges at Lehigh Valley until October 15, 1995.

In March 1994, Angelico notified St. Luke's that he was resigning his staff privileges. He then attempted to apply for staff privileges at Easton. Easton, however, informed him that it had adopted a temporary moratorium on applications in its newly established heart program because it was considering whether to award an exclusive contract. Later, Easton informed Angelico that it had awarded an exclusive contract to another surgeon from outside of the region.

Angelico asserts that he resigned from St. Luke's because the hospital willfully failed to provide him with competent surgical support and that he was therefore constructively terminated. He further contends that the hospital defendants had a sufficient share of the relevant market to control it and that they conspired to eliminate him as a competitor through "various predatory acts," including circulating defamatory remarks regarding his interpersonal and patient care skills. Angelico claims that his courtesy privileges at Lehigh Valley were improperly terminated as a part of this conspiracy and that he has now been "blackballed" by the three hospitals.

Angelico sued the three hospitals and two practice groups, alleging that they had violated the Sherman Act by conspiring to eliminate him as a competitor. Specifically, he claims that the hospital defendants engaged in exclusive dealing and a group boycott in violation of section 1 of the Sherman Act, 15 U.S.C. S 1, and that they control a dominant (monopoly) share of the market in violation of section 2 of the Sherman Act, 15 U.S.C. S 2. He seeks treble

damages under section 4 of the Clayton Act, 15 U.S.C. S 15. Angelico also argues that the attorney defendants violated his constitutional rights through their use of the state subpoena process and that the District Court improperly assessed attorney's fees against him.

The District Court dismissed Angelico's claims against the attorney defendants and granted the attorney defendants' motion for sanctions. See Angelico v. Lehigh Valley Hosp., Inc., No. Civ.A. 96-2861, 1996 WL 524112 (E.D. Pa. Sept. 13, 1996) ("Angelico I"). On Angelico's antitrust claims, the District Court granted a motion by the hospital defendants for limited discovery on the issues of antitrust standing and antitrust injury. Following discovery, the court granted the hospital defendants summary judgment on the antitrust claims, holding that Angelico had failed to establish standing to pursue them. See Angelico v. Lehigh Valley Hosp., Inc., 984 F. Supp. 308 (E.D. Pa. 1997) ("Angelico II").

The District Court noted that Angelico suffered significant lost income but held that "an injury to Dr. Angelico personally does not confer standing upon him without a showing that his absence from the relevant product and geographic markets injured competition and/or the consumers of cardiothoracic surgical services in these markets." Id. at 313. Focusing on the effect of Angelico's removal on the market, the court found "no evidence" that there were any fewer competing surgeons or that the quality of cardiothoracic care had been reduced by his absence, see id., and "insufficient evidence of a negative impact on price." Id. at 314. Based on these findings, the District Court concluded that Angelico had not "suffered the type of injury that the antitrust laws were designed to prevent . . . [or] that Dr. Angelico is the most efficient enforcer of those laws." Id.

On appeal, Angelico argues that the District Court erred by: (1) holding that he failed to establish antitrust standing because he could not show an effect on the prices, quantity or quality in the relevant market; (2) failing to declare that the hospital defendants' acts were illegal "per se"; (3) holding that he failed to state a section 1983 claim upon which relief could be granted against the attorneys for

5

Lehigh Valley, and (4) imposing sanctions against him without holding a hearing. We have plenary review of the antitrust standing question, see McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 847 (3d Cir. 1996), and of the summary judgment on Angelico's claims against the hospital defendants. See Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1297 (3d Cir. 1993). We review an assessment of attorney's fees for abuse of discretion if the court applied the correct legal standard. See In re Tutu Wells Contamination Litig., 120 F.3d 368, 387 (3d Cir. 1997).

II. The Antitrust claims

In this case, we must distinguish the antitrust injury that is required for a plaintiff to have standing to bring an antitrust claim from the anticompetitive market effect element of a claim under section 1, which is also generally referred to as "antitrust injury."

A. Antitrust Standing

Section 4 of the Clayton Act, 15 U.S.C. S 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." Id. Antitrust standing, however, is narrower than the statute's wording indicates. See Associated Gen. Contractors of Cal. v. California State Council of Carpenters , 459 U.S. 519, 103 S. Ct. 897 (1983) ("AGC"); II Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application P 360, at 192 (rev. ed. 1995) ("The limitations on antitrust standing are only hinted at by the simple and apparently broad language of S4 of the Clayton Act.").

An antitrust injury is an " `injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.' " Cargill, Inc. v. Monfort, Inc., 479 U.S. 104, 109, 107 S. Ct. 484, 489 (1986) (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S.

6

477, 489, 97 S. Ct. 690, 697 (1977)); see also In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1163 n.9 (3d Cir. 1993) (standing analysis involves consideration of "the nexus between the antitrust violation and the plaintiff 's harm" and "whether the harm alleged is of the type for which Congress provides a remedy"). The focus is broader than the injury suffered by the potential plaintiff. Although a showing of antitrust injury is necessary, it is "not always sufficient[ ] to establish standing under [section] 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under [section] 4 for other reasons." Cargill, 479 U.S. at 110 n.5, 107 S. Ct. at 489 n.5.

Drawing on AGC, we have stated the factors to be employed in a standing analysis under section 4 of the Clayton Act. These are:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff 's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

In re Lower Lake Erie Iron, 998 F.2d at 1165-66 (citing AGC, 459 U.S. at 545, 103 S. Ct. at 912). We hold that, applying these factors, Angelico has standing to challenge the alleged conspiracy, boycott and monopoly.

First, because no discovery was allowed on the issue, we must assume Angelico's allegation that the defendants acted in concert and with an anticompetitive motive, i.e., conspired, is true. Following this assumption, Angelico's harm clearly resulted from the conspiracy that prevented him from competing in the market and thereby earning a living. At this stage, therefore, the causal connection/defendant intent element of the standing analysis is satisfied.

7

Turning to the second element, whether Angelico's alleged injury is of the type the antitrust laws were meant to redress, we conclude that the injury he suffered, when shut out of competition for anticompetitive reasons, is indeed among those the antitrust laws were designed to prevent. In Brader v. Allegheny General Hospital , 64 F.3d 869 (3d Cir. 1995), a doctor sued a hospital and individual physicians, alleging similar claims under sections 1 and 2 of the Sherman Act. The district court dismissed the claims, and we reversed, holding that Brader, as a potential competitor shut out of a market by a purported group boycott, had alleged the type of injury protected by the antitrust laws. We stated: "the type of injury alleged by Brader (the loss of income due to an inability to practice in the relevant market area) is directly related to the illegal activity in which the defendant allegedly engaged: a conspiracy to exclude Brader from the relevant market." Id. at 877.1 Angelico, like Brader, alleges a concerted effort to exclude him from the market for cardiothoracic surgery and his injury flows directly from this action. See In re Lower Lake Erie, 998 F.2d at 1164 n. 14 ("Because the [plaintiffs] themselves were direct competitors of the [defendants] and because they were injured by the conspiracy's goal to preclude them from market entry, no standing problem is posed by their quest for damages."); Fuentes v. South Hills

_____

1. Appellees assert that only persons with the same interests as consumers have standing under the antitrust laws and cite Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977), in which the Supreme Court stated:

> The antitrust laws . . . were enacted for the protection of competition
> not competitors . . . . The injury should reflect the anticompetitive
> effect either of the violation or of anticompetitive acts made possible
> by the violation. It should, in short, be the type of loss that the
> claimed violations . . . would be likely to cause.

429 U.S. 477, 488-89, 97 S. Ct. 690, 697 (internal quotes omitted) (emphasis added). Nevertheless, the fact that the antitrust laws are intended to protect competition rather than competitors does not mean that a competitor is never a proper antitrust plaintiff. Indeed, protecting
a competitor's ability to compete from a conspiracy, the sole purpose of which is to decrease competition by eliminating that competitor, is clearly in the interest of competition.

Cardiology, 946 F.2d 196, 202 (3d Cir. 1991) (not addressing standing directly, but noting that similar allegations by a doctor were sufficient to state a claim and to avoid a motion to dismiss).

Angelico also satisfies the third, fourth and fifth elements of the AGC standing analysis. The injury to Angelico from the assumed conspiracy is clearly direct (and substantial). Angelico's injury is the direct result of the alleged conspiracy. In contrast, the harm to consumers is less direct because it will only arise from higher costs or poorer treatment that result from the removal of a strong competitor from the market. A consumer would be highly unlikely to sue for a loss of this type. Finally, there is no potential for duplicative recovery or complex apportionment of damages, see, e.g., Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S. Ct. 2061 (1977), because Angelico's injury has not been passed along to others.

In sum, we hold that Angelico has standing. This is not a case, however, in which we grant standing to a competitor who was simply harmed by strong competition. Rather, Angelico has asserted facts indicating that he was harmed by a conspiracy with an illegal anticompetitive intent. He has standing because he has asserted an injury of "the type the antitrust laws were designed to prevent" flowing from "that which makes the defendants' acts unlawful." Cargill, 479 U.S. at 109, 107 S. Ct. at 489. Because the District Court's determination was based on its premise that Angelico did not have standing, we must remand the cause.2

B. Anticompetitive market effect

Section 1 of the Sherman Act, 15 U.S.C. S 1, prohibits "contracts, combinations or conspiracies `in restraint of trade.' " City of Pittsburgh v. West Penn Power Co., 147 F.3d
_____

2. The District Court erred by incorporating the issue of anticompetitive market effect into its standing analysis, confusing antitrust injury with an element of a claim under section 1 of the Sherman Act, 15 U.S.C. S 1, which prohibits "contracts, combinations or conspiracies `in restraint of trade.' " The court's approach may have been the result of the similar "antitrust injury" label which is applied to the injury component of antitrust standing analysis and to the marketplace harm element under section 1.

256, 267 (3d Cir. 1998). To establish a section 1 claim under the rule of reason test,3 plaintiffs must prove,

> (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination 953<!>or conspiracy produced adverse, anti-competitive
>
> effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

Tunis Bros., 952 F.2d at 722 (citations omitted). The second element may be satisfied in two ways:

> The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods and services. Due to the difficulty of isolating the market effects of the challenged conduct, however, such proof is often impossible to make.

_____

3. We reject Angelico's assertion (citing Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959)) that the hospital defendants' acts should be held illegal per se. Courts follow one of two lines of analysis to assess the validity of section 1 claims. See Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 342-47, 102 S. Ct. 2466, 2472-74 (1982). The first, "rule of reason" analysis, applies in most cases under this section,
while the second, "per se" analysis, applies only to "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." National Soc'y of Prof. Eng'rs v. United States, 435 U.S. 679, 692, 98 S. Ct. 1355, 1365 (1978).

Group boycotts or concerted refusals to deal are not always per se violations of the Sherman Act; rather, the analysis turns on the facial effects of the challenged practice. See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 105 S. Ct. 2613 (1985). Similar cases involving medical professionals have utilized the "rule of reason" analysis. See Betkerur v. Aulthman Hosp. Ass'n, 78 F.3d 1079, 1088-93 & n. 9 (6th Cir. 1996) (discussing and rejecting application of per se analysis to a doctor's claims under section 1 and citing, in the footnote, Lie v. St. Joseph Hosp., 964 F.2d 567, 570 (6th Cir.1992), and other cases holding that rule of reason analysis is normally applied to claims by physicians in the position of Angelico). We see no reason to depart from this approach.

10

> Accordingly, the courts allow proof of the defendant's
> "market power" instead. Market power--the ability to
> raise prices above those that would prevail in a
> competitive market--is essentially a " `surrogate for
> detrimental effects.' "

Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367 (3d
Cir. 1996) (citations omitted); see also VII Phillip E. Areeda,
Antitrust Law: An Analysis of Antitrust Principles and Their
Application P 1511, at 429 (1986).

Although the District Court considered Angelico's
proffered evidence of an actual anticompetitive market
effect, we will not address that evidence because it is
appropriate that the District Court reconsider it within the
legal framework we have outlined.4 This will give the court
the opportunity to address Angelico's claim that he need
not show actual anticompetitive market effect in this
instance because of the Appellees' alleged market power.5

_____

4. We note in this regard that Angelico's counsel conceded at oral
argument that he did not need further discovery into the element of
marketplace harm.

We likewise decline the hospital defendants' suggestion that we affirm
the District Court's holding on the ground that Angelico failed to
properly define or prove the relevant product and geographic markets
because the District Court did not address the issue. See Angelico II, 984
F. Supp. at 313 (assuming for the purposes of the limited motion for
summary judgment that the relevant product market was "cardiothoracic
surgical services" and that the relevant geographic market was "the
greater Lehigh Valley consisting of Carbon, Monroe, Lehigh,
Northampton and Schuylkill Counties").

5. Moreover, a finding of no anticompetitive market effect would not
suffice to dispose of Angelico's claim under section 2 of the Sherman Act.
See Mahone v. Addicks Util. Dist., 836 F.2d 921, 939 (5th Cir. 1988)
("[P]roving an injury to competition is not an element of a
monopolization-based antitrust claim."). It is sufficient to note that it
remains for the District Court to further assess these issues at the
summary judgment stage. See Brader, 64 F.3d at 876 ("[T]he adequacy
of a physician's contentions regarding the effect on competition is
typically resolved after discovery, either on summary judgment or after
trial.").

11

III. The section 1983 claim

Angelico asserts that the District Court erred by holding that he failed to state a claim upon which relief could be granted against the attorney defendants under section 1983. This claim arises out of the litigation of a related state court suit that was resolved during the course of this litigation. Geoffrey Toonder, a cardiothoracic surgeon, sued Lehigh Valley Hospital, claiming that it improperly denied Toonder an "active manpower slot" that would have been filled by Angelico. See Toonder v. Lehigh Valley Hosp., No. Civ.A. 94-E-18 (Pa. Ct. of Common Pleas May 31, 1995) [the "Toonder litigation"]. Toonder was represented by the same attorneys who represent Angelico. Lehigh Valley, through its attorneys -- defendants Peters and hisfirm, Post & Schell, P.C. -- subpoenaed various members of St. Luke's staff, seeking information regarding Angelico's resignation from that hospital. Angelico claims that, through the use of the subpoenas, the attorney defendants violated his constitutionally protected property and liberty interests. The District Court dismissed these claims. See Angelico I, 1996 WL 524112.

Under 42 U.S.C. S 1983, Angelico must show that the attorney defendants acted under the color of state law and denied him a federally protected constitutional or statutory right. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 930, 102 S. Ct. 2744, 2750 (1982); Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1264 (3d Cir. 1994). Because Angelico sued private individuals for actions taken in their roles as attorneys, he must point to some action that is "fairly attributable" to the state. Lugar, 457 U.S. at 937, 102 S. Ct. at 2753. To do this, Angelico must show (1) that the attorney defendants' acts were "the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible" and (2) that the attorney defendants may fairly be said to be state actors. Id.

A person may be found to be a state actor when (1) he is a state official, (2) "he has acted together with or has obtained significant aid from state officials," or (3) his conduct is, by its nature, chargeable to the state. Id. at 937, 102 S. Ct. at 2753-54. The Supreme Court noted that

12

"[w]ithout a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." Id. at 937, 102 S. Ct. at 2754.

Attorneys performing their traditional functions will not be considered state actors solely on the basis of their position as officers of the court. See, e.g., Polk County v. Dodson, 454 U.S. 312, 318, 102 S. Ct. 445, 450 (1981) ("[A] lawyer representing a client is not, by virtue of being an officer of the court, a state actor `under color of state law' within the meaning of S 1983."); Barnard v. Young, 720 F.3d 1188, 1189 (10th Cir. 1983) ("[P]rivate attorneys, by virtue of being officers of the court, do not act under color of state law within the meaning of section 1983."). Angelico asserts, however, that the attorneys acted as state officers in issuing the subpoenas because the "state subpoena procedures now empower the attorneys, as officers of the state, to use subpoenas to seize property without a hearing before a state court judge and without participation by the sheriff." Appellant's Br. at 44. Angelico, however, offers no authority to support this statement. Nor does Pennsylvania law provide any indication that attorneys have been granted elevated powers to use subpoenas.6

_____

6. The Pennsylvania Rules of Procedure state:

> (a) A subpoena is an order of the court commanding a person to attend and testify at a particular time and place. It may also require the person to produce documents or things which are under the possession, custody or control of that person.
>
> * * *
>
> (b) A subpoena may be used to command a person to attend and to produce documents or things only at
>
>  (1) a trial or hearing in an action or proceeding pending in the court, or
>
>  (2) the taking of a deposition in an action or proceeding pending in the court.
>
> (c) A subpoena may not be used to compel a person to appear or to produce documents or things ex parte before an attorney, a party or a representative of the party.

Pa. R. Civ. P. 234.1 (emphasis added).

13

As we said in Jordan, "[b]efore private persons can be considered state actors for purposes of section 1983, the state must significantly contribute to the constitutional deprivation, e.g., authorizing its own officers to invoke the force of law in aid of the private persons' request." 20 F.3d at 1266. Angelico claims that by issuing a subpoena, private attorneys use "the same compulsive powers of the state." Appellant's Br. at 45. We disagree. In Jordan, attorneys, on behalf of a client, entered a judgment by confession and then executed on that judgment. See id. at 1264-67. We held that an "entry of the judgment is not a state action involving the force of law to an extent sufficient to hold that private persons become state actors." Id. at 1266. Then, focusing on the role of the sheriff, a state official, in the execution of the judgment, we stated:

> a private individual who enlists the compulsive powers of the state to seize property by executing on a judgment without pre-deprivation notice or hearing acts under color of law and so may be held liable under section 1983 if his acts cause a state official to use the state's power of legal compulsion to deprive another of property.

Id. at 1267 (emphasis added).

In dismissing Angelico's claim, the District Court properly applied Jordan by focusing on the distinction between the potential for state involvement and actual state involvement.

> Although plaintiff notes that there are potential legal consequences attached to failure to obey a subpoena which might ultimately involve invoking the assistance of state officials, such possibility serves only to highlight the difference between resorting to an available state procedure and actually using state officials to enforce or carry out that procedure. The potential for involving the coercive power of the state likewise exists when a judgment by confession is entered, yet . . . a private party is not converted into a state actor as long as the assistance of state officials remains merely a potential threat. It is only when, and if, such potential is realized that a private party may be

14

        converted into a state actor for purposes of satisfying
        the state action element of a S 1983 claim.

Angelico I, 1996 WL 524112, at *2. The court's analysis is
sound and consistent with the Supreme Court's analysis in
Lugar. We hold, therefore, that an attorney does not
become a state actor simply by employing the state's
subpoena laws. See Barnard, 720 F.3d at 1189 ("If an
attorney does not become a state actor merely by virtue of
instigating state court litigation, then the attorney does not
become a state actor merely by employing state authorized
subpoena power." (citations omitted)). Angelico's section
1983 claim against the attorney defendants therefore fails.7

IV. Sanctions

In the same order in which it dismissed the section 1983
claims, the District Court agreed to award sanctions to the
attorney defendants in the form of attorney's fees. See
Angelico I, 1996 WL 524112. In his complaint, Angelico
stated his antitrust claims against "all defendants," thereby
including the attorney defendants as defendants to the
antitrust claims. Angelico declined to dismiss the charges
against them despite their verbal request that he do so.
Only after the attorney defendants filed their motion to
dismiss, addressing the antitrust claims, did Angelico
voluntarily dismiss these claims. Angelico's counsel then
informed the attorney defendants that the antitrust claims
had not been intentionally asserted against them. Following
a motion for sanctions and the filing of an affidavit of costs

_____

7. Because Angelico has not demonstrated that the attorney defendants
were state actors, we need not address the balance of the section 1983
analysis. We also reject Angelico's claim that his due process rights were
violated by the attorney defendants' actions in regards to the subpoenas.
Finally, we reject Angelico's allegation that the District Court engaged
in
improper fact finding. This allegation apparently refers to the District
Court's understanding that no actual state officials were called upon to
enforce the subpoenas in the Toonder litigation. However, the District
Court was entitled to take judicial notice of the facts of that decision.
See
Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 416 n.3
(3d Cir. 1988); 5A Charles A. Wright & Arthur R. Miller, Federal Practice
and Procedure S 1364, at 479 n.36 (2d ed. 1990).

by the defendants, a Motion to Vacate, Reconsider or Certify Pursuant to 28 U.S.C. S 1292(b) by Angelico, and a response thereto by the attorney defendants, the District Court awarded $1,000 to attorney Peters for his costs in preparing to defend the withdrawn antitrust claims against him and his firm.8

Awarding attorney's fees as a means of sanctioning a party is within the District Court's inherent power. See Chambers v. NASCO, Inc., 501 U.S. 32, 45, 111 S. Ct. 2123, 2133 (1991). The District Court can assess attorney's fees when a party has acted in bad faith. See Chambers, 501 U.S. at 45, 111 S. Ct. at 2133. Here the District Court found that Angelico and his attorneys acted in bad faith by failing to dismiss the antitrust claims against the attorney defendants, by mischaracterizing the defendants' pleadings, and by failing to inform the court of a significant change in the Toonder litigation (its dismissal). See Angelico v. Lehigh Valley Hosp., No. Civ.A.96-2861, Order (E.D. Pa. Nov. 1, 1996). The District Court applied the correct legal standard to determine whether sanctions were in order and carefully stated the acts by Angelico's counsel upon which the order is based.9

Although, "like other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record," Roadway Express, Inc. v. Piper, 447 U.S. 752, 767, 100 S. Ct. 2455, 2464 (1980), we have not interpreted the "opportunity for a hearing on the record" discussed by the Supreme Court to require an evidentiary hearing in every case. See Rogal v.

_____

8. The original decision stated that the court would award "modest monetary sanctions" and required the attorney defendants to submit a record of their costs. Upon receiving the submissions, the District Court found that the costs were far greater than it had anticipated and elected to award only the $1,000.

9. We reject Angelico's assertion that the attorney defendants should have realized that they were not subject to the antitrust claims because it implies that the nonfiling side should bear the burden of an allegedly inadvertent pleading mistake. The attorney defendants requested that the claims against them be dropped. The fact that the attorney defendants did not specifically address the antitrust claims does not serve as an escape hatch for the defendants.

16

American Broad. Cos., 74 F.3d 40, 44 (3d Cir. 1996); see also G.J.B. & Assocs. v. Singleton, 913 F.2d 824, 830 (10th Cir. 1990) (while counsel generally deserve an opportunity to brief the issue, the imposition of sanctions does not necessarily mandate an oral or evidentiary hearing). Rather, the concept of due process is flexible and whether a hearing is required depends upon the circumstances. See Rogal, 74 F.3d at 44. Application of this flexible standard is generally left to the District Court's discretion. See Jones v. Pittsburgh Nat'l Corp., 899 F.2d 1350, 1359 (3d Cir. 1990) (noting that this approach "permits some cases to be disposed of on the record").

Here, the District Court decided that further factfinding was unnecessary. Appellant had both fair notice of the charges and an opportunity to respond because the motion for sanctions was made along with attorney defendants' motion to dismiss. All of the acts by Angelico and his counsel that were at issue were part of the record and could be considered without an evidentiary hearing. We find no abuse of discretion.10

V. Conclusion

We conclude that the District Court did not err by dismissing the section 1983 claims against the attorney defendants, and that it was well within its considerable discretion when it imposed sanctions. Angelico, however, has standing to assert his antitrust claims, and we will remand the cause for further proceedings.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

10. In addition, the District Court made additional findings of bad faith. In choosing not to sanction Appellant for this other conduct, the court doubtless took into account that it was already sanctioning him for the antitrust claims.